IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **APRIL ROBLES,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:20-CV-1188-L** |
| | § | |
| **EMINENT MEDICAL CENTER, LLC** | § | |
| **and EMINENT MEDICAL CENTER** | § | |
| **OPERATING, LLC,** | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court are Defendants' Motion for Summary Judgment (Doc. 29), filed February 22, 2022; Plaintiff's Motion to Strike Defendants' Motion for Summary Judgment Brief (Doc. 42), filed March 21, 2022; Plaintiff's Motion for Rule 11 Sanctions (Doc. 56), filed April 11, 2022; Plaintiff's Motion to Strike Defendants' Summary Judgment Reply, or Alternatively, for Leave to File Summary Judgment Surreply (Doc. 61), filed April 20, 2022; Defendants' *Daubert* Motion (Doc. 26), filed February 22, 2022; and Plaintiff's Amended Request for Oral Argument of Summary Judgment Related Motions (Doc. 60), filed April 12, 2022. After careful consideration of the motions, responses, replies, appendices, record, and applicable law, the court **grants in part** and **denies in part** Defendants' Motion for Summary Judgment (Doc. 29); **denies** Plaintiff's Motion to Strike Defendants' Motion for Summary Judgment Brief (Doc. 42); **denies** Plaintiff's Motion for Rule 11 Sanctions (Doc. 56); **denies as moot** Plaintiff's Motion to Strike Defendants' Summary Judgment Reply (Doc. 61), and **denies** Plaintiff's Motion for Leave to File Summary Judgment Surreply (Doc. 61), filed in the alternative; **grants** Defendants' *Daubert* Motion (Doc. 26); and **denies** Plaintiff's Amended Request for Oral Argument of Summary Judgment Related

Motions (Doc. 60), as the court is able to resolve the pending motions based on the briefing and record before it.

## I.    Procedural and Factual Background

On May 11, 2020, Plaintiff April Robles ("Ms. Robles" or "Plaintiff") filed this employment action against her former employer, Eminent Medical Center, LLC and Eminent Medical Center Operating, LLC (collectively, "EMC" or "Defendants").[1] In her First Amended Complaint (Doc. 11), the live pleading, Ms. Robles alleges that Defendants terminated her employment because she sought leave under the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA") and because of an alleged disability. She also contends that Defendants interfered with her FMLA rights and failed to accommodate her alleged disability. She brings claims for discrimination, retaliation, and interference under the FMLA; and (2) disability discrimination and retaliation in violation of both the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*, and Chapter 21 of the Texas Labor Code ("TLC"), Tex. Lab. Code Ann. § 21.001 *et seq.*  *See* Pl.'s First Am. Compl. (Doc. 11). She also alleges Defendants breached an agreement to pay her damages arising from an alleged negligent medical procedure performed on June 10, 2019. *Id.* Ms. Robles seeks compensatory damages in

---

[1] The relationship between Eminent Medical Center, LLC and Eminent Medical Center Operating, LLC is not entirely clear from the pleadings or the evidence. Defendants assert that "Eminent Medical Center, LLC is incorrectly named as a defendant, as that entity did not employ Plaintiff and is not a proper party." Defs.' Ans. to Pl.'s First Am. Compl. 1, at note 1 (Doc. 13); *see also* Defs.' Summ. J. Brief 7 (Doc. 30) ("Eminent Medical Center Operating, LLC [] was Robles' employer."); *id.* at note 2 ("The named Defendant Eminent Medical Center, LLC has no employees."). In response to Defendants' Motion for Summary Judgment, however, Plaintiff provides some evidence that the two entities share management and human resources. *See* Pl.'s Summ. J. Resp. Brief 1, at note 1 (Doc. 39). At this juncture, therefore, the court refers to the two entities collectively as "Defendants" or "EMC." Whether the two entities may be considered joint employers, or whether Eminent Medical Center, LLC is not a proper party, needs to be resolved prior to resolution or trial of this action.

the form of lost compensation and benefits, liquidated damages, prejudgment interest, attorney's fees, and costs. *See id.*

On February 22, 2022, Defendants filed a motion for summary judgment seeking dismissal of all Ms. Robles' claims. They contend they terminated her employment because of documented, ongoing issues with her conduct and job performance, for which she had been previously warned, demoted, and reprimanded, and not because of any unlawful motives. Ms. Robles filed a response to Defendants' Motion for Summary Judgment on March 21, 2022, contending that genuine disputes of material fact preclude summary judgment on her claims. Along with her response, she filed a motion to strike Defendants' summary judgment brief contending, among other things, that evidence upon which Defendants rely in their brief is hearsay and that Defendants failed to comply with Rule 56 of the Federal Rules of Civil Procedure. On April 11, 2022, Defendants filed their reply in further support of their summary judgment motion as well as a response to the motion to strike. On April 20, 2022, Ms. Robles filed a motion to strike Defendants' summary judgment reply brief or, in the alternative, for leave to file a surreply, and she also filed a reply to Defendants' response to her motion to strike their summary judgment brief. In addition, on April 11, 2022, Ms. Robles filed a motion for Rule 11 sanctions that has been fully briefed. Finally, Defendants have filed a motion to exclude or limit the expert report of Ms. Robles' vocational economist, Dr. Allyn Needham, arguing that his report is unreliable and irrelevant under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993). This motion has also been fully briefed.

The court now sets forth the facts upon which it relies to resolve the pending motion for summary judgment. In setting forth the facts, the court applies the summary judgment standard as set forth in the following section of this opinion.

### A. EMC's Business

Defendants own and operate a surgical center in Richardson, Texas. During all relevant times, Dr. Stephen Courtney, a spine surgeon, was the owner and chief medical officer of the surgical center. Pl.'s Summ. J. Resp. App. 1266.[2] Other executives include Rhonda Lopp ("Ms. Lopp"), the chief executive officer (*id.* at 300); Kevin Griffin ("Mr. Griffin"), the director of human resources (*id.* at 597); David Castro ("Mr. Castro"), the chief nursing officer (*id.* at 801); and Jessica Strother ("Ms. Strother"), the director of quality (*id.* at 1255).

### B. Ms. Robles' Employment

Ms. Robles is a registered nurse. Defs.' Summ. J. App. 2. Defendants hired Ms. Robles in October 2018 for the position of Supervisor of PreOp and PACU (post-anesthesia care unit). *Id.* at 4, 5, 69, 94-97. The PreOp area is where patients are prepared for surgery, and the PACU area is where the patients recover after surgery. *Id.* at 179-180. Although Ms. Robles initially reported to Joe Garofanello, he left shortly after she was hired, and she subsequently reported to Mr. Castro. *Id.* at 10.

At the time she was hired, Ms. Robles completed an Employee Health Assessment. *Id.* at 70-71. As part of that assessment, she represented that she did not have a disability, that she did not have a physical condition requiring restricted activity, that she could perform all essential functions of the job, and that she did not require any job modifications. *Id.* at 6-8, 70-71.

Ms. Robles supervised six nurses. *Id.* at 12. As a supervisor, Ms. Robles was a leader, and it was important for her to set a good example for the other employees. *Id.* at 13, 96-97.

---

[2] The appendix in support of Plaintiff's response to Defendants' summary judgment motion is 1,451 pages and spans several docket entries. *See* Docs. 44-51. For ease of reference, the court will refer to Plaintiff's entire appendix as "Pl.'s Summ. J. Resp. App." The court will refer to the appendix in support of Defendants' motion for summary judgment (Docs. 32 and 33) as "Defs.' Summ. J. App."

### C. Ms. Robles Undergoes Two Medical Procedures as a Patient at EMC

While Ms. Robles worked as a registered nurse at the surgical center, she was also a patient on two occasions. On June 10, 2019, she received a steroid injection to treat several herniated discs in her neck. Pl.'s Summ. J. Resp. App. 205, 1314, 1319. While in recovery from anesthesia, Ms. Robles suffered an injury—in the form of chronic right upper extremity and hand pain—after a staff nurse gave her an improperly diluted injection of Phenergan. *Id.* at 125, 205-206. Ms. Robles has filed a separate personal injury/medical malpractice case against Defendants related to her alleged injury from the Phenergan injection. That lawsuit is pending in state court.

Ms. Robles also underwent a carpal tunnel release procedure at the surgical center on August 8, 2019. Defs.' Summ. J. App. 27-28. Before the procedure, she conferred with Ms. Lopp about the need for carpal tunnel release procedure and told her it was required because her condition was exacerbated by the problems associated with the administration of an improperly diluted injection of Phenergan following the June 10, 2019 procedure. Pl.'s Summ. J. Resp. App. 125, 390-391. Ms. Lopp stated to Ms. Robles that Defendants would cover the co-payment for the August 2019 carpal tunnel release procedure and urged her to undergo the procedure at the surgical center so that Defendants could waive portions of the charges. *Id.* at 125, 391. Defendants ultimately issued two checks to Ms. Robles related to her August 2019 carpal tunnel release procedure. One check was for her out-of-pocket medical expenses and the other was for lost wages. Defs.' Summ. J. App. 61; Pl.'s Summ. J. Resp. App. 125, 394. Thereafter, Ms. Lopp informed Ms. Robles that Defendants were referring her claim to their medical malpractice insurer, Medpro Group, and asked her to give all further receipts to the adjuster. Pl.'s Summ. J. Resp. App. at 226-228. Ms. Robles has continued medical expenses based on monthly physician visits and treatments related to the alleged injury she suffered as a result of the June 10, 2019 procedure. *Id.* at 231-233.

Following the carpal tunnel release procedure, her doctor (Dr. Saadi) released her to return to work on August 14, 2019. Defs.' Summ. J. App. 86. The work release issued by Dr. Saadi contained two restrictions in effect for four weeks—Ms. Robles was to wear a hand brace as needed and she had a five-pound lifting restriction. *Id.* at 27-30, 86. The work release also included a handwritten addendum at the bottom of the page stating that Ms. Robles "must have another available in area [in the event] assistance is needed." *Id.* at 30, 86. EMC's employee health nurse approved the restrictions, and Ms. Robles returned to work. *Id.* at 30, 86, 287, 290-291. Although the handwritten addendum provided that Ms. Robles should have assistance from others in the area, at times she performed her duties without assistance, even though she requested assistance from Mr. Castro and Ms. Strother. Pl.'s Summ. J. Resp. App. 160-162.

### D.  Ms. Robles' Conduct Issues and Receipt of a Written Warning

Ms. Robles was tardy for her work shift on numerous occasions, and, at times, staff were not able to locate her. Defs.' Summ. J. App. 98, 110,157, 181-182, 185-185. Her supervisor, Mr. Castro, repeatedly observed her texting and using social media instead of working. *Id.* at 98-99, 109. He and Ms. Robles' co-workers also observed her putting on makeup and brushing her hair in areas other than the locker room or bathroom—which were the only areas where that was permitted for purposes of infection control—and observed that she kept personal items in areas where they were not allowed. *Id.* at 98-100, 112-113,186-187. Defendants counseled Ms. Robles on these issues. *Id.* at 108-118, 158-168.

On August 23, 2019, Mr. Castro issued an "Employee Counseling Form" to Ms. Robles that was marked as a "second level warning." *Id.* at 162-165. The Employee Counseling Form included Mr. Castro's observations concerning what he considered Ms. Robles' lack of leadership, professionalism, accountability, and work ethic. *Id.* Mr. Castro and Ms. Lopp met with Ms. Robles

to discuss the Employee Counseling Form. *Id.* at 23-34, 123. At the meeting, Mr. Castro emphasized that, as a supervisor, Ms. Robles was trusted to lead and set a professional example to her subordinates. *Id.* at 119-120, 123. Ms. Robles signed the Employee Counseling Form. *Id.* at 122, 166-167.

### E.   Ms. Robles' Demotion Effective October 1, 2019

Mr. Castro monitored Ms. Robles' performance after the written warning. *Id.* at 123-124. He observed that she continued to engage in many of the same behaviors that led to the previous warning. *Id.* at 126-131. As a result, on September 30, 2019, Mr. Castro and Ms. Lopp met with Ms. Robles to inform her that she was being removed from the supervisor role and demoted to a staff nurse position in PreOp/PACU, effective October 1, 2019. *Id.* at 132-133, 168-169. Ms. Robles' pay was reduced from $43/hour to $40/hour, to correspond with her removal from the supervisor position. *Id.* at 135-36, 168. Mr. Castro gave Ms. Robles a letter discussing problematic behaviors he had observed following the second level warning issued on August 23, 2019. Ms. Robles signed the letter acknowledging the demotion. *Id.* at 168.

### F.   Ms. Robles Reporting to Ms. Roberts

Following the demotion, Ms. Robles began reporting to Lindsey Roberts ("Ms. Roberts"), who had previously been her subordinate. Ms. Roberts observed that Ms. Robles continued with many of the same behaviors that had resulted in her second level warning, including that she was frequently tardy for work, used her cell phone excessively, applied makeup and got dressed at work, and that her coworkers complained that they could not find her during working hours. *Id.* at 193-201, 254. On Thursday, December 5, 2019, Ms. Roberts met with Ms. Robles at the end of the day and discussed with her the excessive cell phone usage, continued tardiness, lack of focus, unreliability, and poor teamwork. *Id.*

### G.   The Events of Friday, December 6, 2019

On Friday, December 6, 2019, a staff member reported to Ms. Roberts that she overheard Ms. Robles loudly saying "You're such a dick" to one of the anesthesia providers and within hearing range of a pre-operative area full of patients. *Id.* at 201-203, 253-54. The anesthesia provider present that day testified at his deposition that he did not specifically recall any such comment and did not feel offended by any comment made by Ms. Robles. Pl.'s Summ. J. Resp. App. 1387-1389.

In addition, on December 6, 2019, Ms. Roberts met with the pre-op nurses in the morning and instructed them not to tell patients that the surgeries were running behind that day and not to provide time estimates to patients. Defs.' Summ. J. App. 204, 206. Later that same day, Ms. Lopp reported to Ms. Roberts that several patients were upset because Ms. Robles told a patient that "we are about 2 hours behind." *Id.* at 203-206, 253-254. Shortly after that incident, another staff member reported another incident to Ms. Roberts. This staff member was a patient tech in school to be a nurse. The tech reported that Ms. Robles told her to go change the gown of a male patient that Ms. Robles found attractive, so the tech could "see his body." Ms. Robles reportedly made these comments in front of another patient, and the tech reported to Ms. Roberts that this made her embarrassed and uncomfortable. *Id.* at 206-208, 253-254.

Later that same day, Ms. Roberts met with Ms. Robles to ask about these incidents. Ms. Robles denied these incidents. Following their discussion, Ms. Roberts sent Ms. Robles back to the floor to care for patients. *Id.* at 213-218.

A few minutes later, Ms. Robles was observed crying in front of a patient, and she stated that her neck hurt. *Id.* at 214-215. Ms. Roberts sent her to take some Ibuprofen and to compose herself. *Id.* at 215. Thereafter, in Ms. Roberts' office, Ms. Lopp met with Ms. Robles and told her

to go home for the day and "to hold off coming to work on Monday, that an investigation was necessary." *Id.* at 37.

Also on December 6, 2019, Ms. Lopp told Ms. Roberts that Ms. Robles has "got to go." Pl.'s Summ. J. Resp. App. 183-184, 1090-1091. Ms. Lopp made it clear to Ms. Roberts that she meant that Ms. Robles "needed to be terminated." *Id.* at 215. Ms. Lopp told the same thing to Mr. Castro. *Id.* at 855. Ms. Roberts then met with Mr. Griffin concerning the events that had transpired. As head of human resources, he directed Ms. Roberts to provide an e-mail to him related to the incidents of December 6. *Id.* at 183-184, 1095-1096. According to Ms. Roberts, on Friday, December 6, or Monday, December 9 at the latest, Mr. Griffin and Ms. Lopp informed her that Ms. Robles would be terminated from her position. *Id.* at 1102.

After Ms. Robles left the surgical facility, she went to the emergency room at Medical City of Plano and remained there until late that same evening and remained in contact with her physician over the ensuing two weekend days, leading to a preoperative visit on Monday, December 9, 2019. *Id.* at 191-194, 426. In addition, she sought to communicate with Ms. Roberts by text and e-mail over the weekend, but Ms. Roberts did not respond. *Id.* at 195, 1100. Ms. Robles later learned that Mr. Griffin or Ms. Lopp, or both, prohibited Mr. Castro and Ms. Roberts from communicating with her. *Id.* at 194-196, 970.

### H.  Ms. Robles' Job Termination on Monday, December 9, 2019

On the morning of December 9, 2019, Ms. Roberts sent the requested e-mail to Mr. Griffin, with a copy to Mr. Castro and Ms. Lopp, summarizing in detail Ms. Roberts' reprimand of Ms. Robles on December 5, 2019, and listing several of the incidents reported to Ms. Roberts on December 6, 2019, many of which Ms. Robles controverts. Defs.' Summ. J. App. 219-221, 253-254.

Mr. Castro, Ms. Roberts, and Ms. Lopp discussed Ms. Robles' job performance and reported conduct issues with Mr. Griffin, the head of human resources, and Ms. Robles was terminated for cause on Monday, December 9, 2019. *Id.* at 224-228, 244, 249, 253-254, 145-147. Mr. Griffin called Ms. Robles on December 9, 2019, and informed her of the termination decision. *Id.* at 242.

Ms. Roberts prepared an Employee Termination Form documenting Defendants' reasons for terminating Ms. Robles, and she and Mr. Griffin signed the form. *Id.* at 224-227, 255-256, 144-146, 173-174. The Employee Termination Form notes Ms. Robles' prior counseling, warning, and demotion, as well as the reported incidents of Ms. Robles' unprofessional conduct both before and on December 6, 2019, some of which she has disputed. *Id.* at 255-56. The Employee Termination Form also states that Ms. Robles arrived late to work (beyond a seven-minute grace period) twelve times in a seven-week period between October 14, 2019, and December 5, 2019. *Id.* Ms. Roberts personally reviewed the time records and confirmed the number of tardies. *Id.* at 229-231.

## I. Ms. Robles' December 9 Preoperative Visit and December 12 Surgery

On Monday, December 9, 2019, prior to receiving Mr. Griffin's phone call notifying her of her termination, Ms. Robles sent Ms. Lopp a text message informing Ms. Lopp that she was preparing to have urgent surgery because of severe pain, and that she had a doctor's appointment and preoperative visit that day. Pl.'s Summ. J. Resp. App. 478, 486. Ms. Robles' text message to Ms. Lopp stated, "I have not heard from anyone yet and I'm getting quite concerned. I have my doctor's appointment and preop[erative] visits today, so I will need someone to contact me." *Id.* at 478.

Ms. Robles met with her doctor on December 9, 2019, and her doctor "put her on leave" retroactively to December 6, 2019. Defs.' Summ. J. App. 40, 51-52. Ms. Robles had surgery at

Medical City of Plano on December 12, 2019. She sent Ms. Roberts a text message on December 12, 2019, informing her of the surgery. *Id.* at 246. On December 15, 2019, Ms. Robles sent an e-mail to Mr. Griffin asserting that her doctor had placed her on FMLA leave effective December 6, 2019. *Id.* at 295-296.

This was not the first time Ms. Robles had mentioned to Defendants the necessity of spinal surgery. On November 5, 2019, Ms. Robles' pain management physician made her aware of the urgent necessity for anterior cervical fusion surgery (which ultimately took place on December 12, 2019) to address the condition of her cervical spinal discs, and she advised Mr. Castro, Ms. Roberts, and Ms. Lopp that she would need to have this surgery. Pl.'s Summ. J. Resp. App. 185-188, 190-191, 1133. Mr. Castro was aware of her need for surgery and asked Ms. Robles to delay the surgery until late December 2019 or early January 2020 because Defendants could not afford to have a nurse out during the fourth quarter. *Id.* at 187-188, 207-208. To suit Mr. Castro, Ms. Robles agreed, with the consent of her surgeon, to schedule her surgery for late December. *Id.* at 187-188, 190.

## II.    Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v.*

*Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458 Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes

over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

III.   **Plaintiff's Motion to Strike Defendants' Summary Judgment Brief and Evidentiary Objections (Doc. 42)**

As a threshold matter, the court addresses Plaintiff's Motion to Strike Defendants' Summary Judgment Brief ("Motion to Strike") and her objections to Defendants' summary judgment evidence. For the reasons that follow, the court **denies** the Motion to Strike and **overrules** the objections.

In her Motion to Strike, Ms. Robles challenges the *entirety* of Defendants' brief, rather than particular summary judgment evidence, and moves to strike the entire brief because of alleged factual disputes. Case law governs the admissibility of unsworn factual assertions made in summary judgment briefing. *See, e.g., Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991) ("Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence."). It is, therefore, unnecessary to consider objections to the contents of briefing that are made under the Federal Rules of Evidence.

In addition, Federal Rule of Civil Procedure 12(f) allows a court to strike a pleading when it contains "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Ms. Robles does not contend that Defendants' summary judgment brief contains any such matter.

Finally, because Ms. Robles generally fails to specify or cite to any specific evidence that is objectionable but merely refers to portions of Defendants' briefing, her objections are improper.

The court should not have to guess as to the basis of a purported objection and declines to do so here. For these reasons alone, the court **denies** Plaintiff's Motion to Strike and **overrules** her objections.

Even were the court to consider the arguments in Plaintiff's Motion to Strike, for the reasons that follow, it would reach the same result. Ms. Robles asks the court to strike Defendants' summary judgment brief for the purported failure to comply with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56 by "their filing of a motion for summary judgment notwithstanding clear disputes of material fact and their failure to cite pertinent portions of their summary judgment evidence within the argument in their summary judgment motion." Pl.'s Am. Reply to Defs.' Resp. to Pl.'s Mot. to Strike 2 (Doc. 59). As Defendants correctly note in response to the Motion to Strike, "Plaintiff's arguments go to the merits of Defendants' motion for summary judgment and are not a proper basis for a motion to strike." Defs.' Resp. to Pl.'s Mot. to Strike 1 (Doc. 58). The court agrees with Defendants that "[p]laintiff's arguments can, and more properly should, be addressed by the Court in determining Defendants' motion for summary judgment." *Id.* at 2. In addition, based on its review of Defendants' brief, the court concludes that Defendants' citation to the evidentiary record to support their summary judgment arguments—and in particular the detailed six-page "Statement of Material Facts"—is more than adequate to satisfy Rule 56 and the Local Rules.

In paragraph 4(a), Ms. Robles maintains that Section II(C) of Defendants' brief discussing her job performance issues is based, in part, on hearsay statements, which she asserts are statements "other than statements of those employees who were deposed and testified of their personal knowledge of any aspects of the performance of Plaintiff . . . ." Pl.'s Mot. to Strike 2 (Doc. 42). Problematically, Ms. Robles fails to specify any of the alleged hearsay statements. This is reason

alone for the court to overrule her objection. In addition, the factual record set forth above reflects that many of the observations related to Ms. Robles' conduct and job performance issues were based on the personal observations of her supervisors, Mr. Castro and Ms. Roberts. Insofar as Ms. Robles is contending that Defendants could not rely on reports pertaining to her conduct and performance that others made to Mr. Castro and Ms. Roberts, the court rejects this argument. These reports, including those summarized by Ms. Roberts in her December 9, 2019 e-mail to Mr. Griffin, do not constitute hearsay as they pertain to the decisionmaker's state of mind in making his or her decision to discipline or terminate an employee. *See, e.g., Brauninger v. Motes*, 260 F. App'x 634, 637 (5th Cir. 2007) (statements made to managers were not hearsay, as they were offered to prove the information upon which managers relied in making decision to terminate an employee); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (allowing out-of-court statements to demonstrate a manager's state of mind in deciding to take adverse employment action against employee); *Zimmerman v. Gruma Corp.*, No. 3:11-CV-01990-L, 2013 WL 3154118, at *9 (N.D. Tex. June 21, 2013) (Lindsay, J.) (overruling plaintiff's hearsay objections and concluding that reports of employee's poor performance by co-workers to the decisionmaker go to the reasons why the decisionmaker discharged employee). The court, therefore, finds Ms. Robles' objections based on hearsay to be without merit and **overrules** her hearsay objections.[3]

 In paragraph 4(d), Ms. Robles objects to the first paragraph in Section II(H) of Defendants' brief in support of summary judgment. Specifically, she argues that

> Section II(H) of the brief, in its third sentence of the first paragraph, as stated, claiming a purported instruction by Lindsay Roberts concerning delays experienced

---

[3] Ms. Robles' remaining hearsay objections relating to Defendants' reliance on reports made to Mr. Castro and Ms. Roberts regarding Ms. Robles' conduct and performance—*see* Pl.'s Mot. to Strike ¶¶ 4(c), 4(h), 4(i), and 4(j)—are **overruled** for the same reason, as Defendants offer these reports to show the state of mind of the employer in making the decision to discipline and discharge the employee and not for the truth of the matter therein asserted. *See, e.g., Brauninger*, 260 F. App'x at 637; *Michael*, 496 F.3d at 598; *Zimmerman*, 2013 WL 3154118, at *9.

**Memorandum Opinion and Order - Page 15**

by patients in being seen by their physicians at Defendants' facility, is not supported by testimony of Roberts, and the fourth sentence of the first paragraph, as stated, claiming a report by Rhonda Lopp to Roberts of patients threatening to leave because of a statement by Plaintiff, is not supported by testimony of Lopp or her personal knowledge.

Pl.'s Mot. to Strike 3 (Doc. 42). Defendants counter that Ms. Roberts

> clearly testified that she instructed the pre-op staff (including Robles) not to provide patients with a specific estimate of time that the surgeries were running behind. Supervisor Roberts also testified that she later received a report from CEO Lopp on December 6, 2019, that Robles had informed patients that they were running two hours behind, contrary to Roberts' instruction.

Defs.' Resp. to Pl.'s Mot. to Strike 5 (Doc. 58). A review of Ms. Roberts' deposition testimony

supports Defendants' argument. Ms. Roberts provided the following testimony at her deposition:

> Q. When you said you already told the pre-op nurses, did you tell them that morning, Friday morning, December 6, 2019?
>
> A. I most likely told them once I got to work and already found out we were behind. Once we get behind, the patients start getting upset, and it's better not to try to give them a timeline that we can't guarantee.
>
> Q. So what was your specific instruction to the pre-op nurses?
>
> A. Just to apologize for the delay and not give any guesstimates of time.
>
> * * *
>
> Q. Can you just read for us your second bullet point there [on your December 9, email recapping the events of December 6, 2019], what that says?
>
> A. A short time later I was informed by Rhonda Lopp that the front office had complained that they heard April tell a patient, we are about two hours behind, loud enough for other patients to hear. We were significantly backed up due to surgeries and procedures taking longer than expected, so I had already told the pre-op nurses not to give patients any times or estimates about how long it would be, or how far behind we were. This caused a lot of frustration and anger amongst the patients in the waiting room.

Defs.' Summ. J. App. 204-206, 253-254. Based on Ms. Roberts' deposition testimony, the court agrees with Defendants and **overrules** this objection to the third sentence of the first paragraph of Section II(H) of the summary judgment brief.[4]

In paragraph 4(e), Ms. Robles contends that the third paragraph of Section II(H) of the summary judgment brief is contrary to the testimony of the diabetic patient. Pl.'s Mot. to Strike 3 (Doc. 42). The court **overrules** this objection as **moot** because it does not rely on the testimony of the diabetic patient in this opinion.

In paragraph 4(f), Ms. Robles contends that the fourth paragraph of Section II(H) of the summary judgment brief "misstates the allegations communicated by Roberts to Plaintiff, but notably, admits that Roberts returned to work after discussing the allegations she did with Plaintiff." Pl.'s Mot. to Strike 3 (Doc. 42). As no objection is stated and Ms. Robles fails to cite to any testimony or to explain the misstatement, the court **overrules** this objection.

In paragraph 4(g), Ms. Robles contends that the seventh paragraph of Section II(H) of the summary judgment brief "misleadingly omits an acknowledgment of the critical text message sent to Lopp by Plaintiff on the morning of December 9, 2019[,] indicating she was obtaining medical treatment and facing imminent surgery" Pl.'s Mot. to Strike 3 (Doc. 42). Once again, no objection is stated, and the court is not under any duty to guess as to the objection. In addition, viewing all evidence in the light most favorable to the nonmoving party, Ms. Robles, in the court's recitation

---

[4] Although the court cannot locate any evidentiary support for Defendants' statement that Ms. Lopp told Ms. Roberts that patients threatened to leave, this discrepancy is not material for summary judgment purposes and does not alter the court's analysis. Ms. Roberts' testimony is clear that she instructed the pre-op nurses not to inform patients of the delay, that Ms. Lopp later informed her that Ms. Robles acted in contravention to this admonition, and that Ms. Robles' behavior caused patients in the waiting room "frustration" and "anger." Defs.' Summ. J. App. 253-254. In addition, even if the information is not accurate, what matters to the court's analysis of the FMLA and disability claims is not whether the employer is objectively correct about an employee's actions, but only whether the employer believed in good faith that the employee engaged in the conduct leading to termination. *Clark v. Champion Nat'l Security*, 952 F.3d 570, 589 n.82 (5th Cir. 2002).

**Memorandum Opinion and Order - Page 17**

of the facts, *see supra* Sec. I, it has included Ms. Robles' text message to Ms. Lopp on the morning of December 9, 2019. Accordingly, the court **overrules** this objection.

For these reasons, the court **denies** Plaintiff's Motion to Strike Defendants' Summary Judgment Brief and **overrules** her evidentiary objections.

## IV.    Plaintiff's Motion to Strike Defendants' Summary Judgment Reply, or Alternatively, for Leave to File Summary Judgment Surreply (Doc. 61)

Ms. Robles moves to strike Defendants' summary judgment reply brief ("Motion to Strike Reply") or, in the alternative, requests leave to file a surreply ("Motion for Leave to File Surreply"). For the reasons that follow, the court **denies as moot** the Motion to Strike Reply and **denies** the Motion for Leave to File Surreply, filed in the alternative.

### A.  Motion to Strike Reply

In support of her Motion to Strike Reply, Ms. Robles argues that Defendants' summary judgment reply raises new grounds for summary judgment and that their appendix in support of the reply brief attaches new evidence. Defendants dispute these contentions.

"Arguments 'raised for the first time in a reply brief are generally waived,' as the responding party is deprived of the opportunity to respond to the new argument." *U.S. Bank, N.A. as Tr. for Registered Holders of AEGIS Asset Backed Sec. Tr. Mortg. Pass-Through Certificates, Series 2005-4 v. Richardson*, No. 3:17-CV-2271-L(BT), 2020 WL 10050787, at *2 (N.D. Tex. June 1, 2020) (Lindsay, J.) (quoting *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010)); *see also AAR, Inc. v. Nunez*, 408 F. App'x 828, 830 (5th Cir. 2011) ("Generally, and for obvious reasons, a reply brief is limited to addressing matters presented by [the movant's] opening brief and by [the respondent's] response brief, and is not the appropriate vehicle for presenting new arguments or legal theories to the court.") (internal quotations omitted). Just as new arguments are inappropriate, it is generally improper for a party to introduce new evidence at the reply stage of a motion

**Memorandum Opinion and Order - Page 18**

proceeding because the purpose of a reply brief is to rebut the nonmovant's response, not to introduce new evidence. *See* N.D. Tex. L. Civ. R. 7.2(e) (appendix may accompany a motion or response, not a reply). Further, "a reply brief that presents dispositive evidence by way of new affidavits and exhibits deprives the nonmovant of a meaningful opportunity to respond." *Lewis v. Southwest Airlines Co.*, No. 3:16-CV-1538-M, 2017 WL 879225, at *3 (N.D. Tex. Mar. 6, 2017) (citation omitted).

In support of her Motion to Strike Reply, Ms. Robles maintains that Defendants, for the first time in their reply brief, contend they are "entitled to summary judgment on Plaintiff's retaliation claims under the [ADA] even after having waived any such opposition in their brief in support of their motion for summary judgment by failing to make in such brief any argument whatsoever addressing such claims." Pl.'s Mot. to Strike Reply 1 (Doc. 61). In response, Defendants contend that they explained in their summary judgment brief the "legitimate reasons for Plaintiff's termination, and why they are entitled to summary judgment on Plaintiff's FMLA and disability discrimination claims in light of those reasons." Defs.' Resp. to Pl.'s Mot. to Strike Reply 1 (Doc. 66). According to Defendants, "In the interest of brevity, rather than repeating the same arguments, Defendants stated in footnote 8 on page 20 of their summary judgment brief that they were entitled to summary judgment for the same reasons on any ADA retaliation claim." *Id.* at 1-2.

The court concludes that, given the overlap in the factual and legal analysis of Ms. Robles' ADA discrimination and retaliation claims, as well as her failure-to-accommodate claims, Defendants' challenge to Ms. Robles' retaliation claims on page 20 of their summary judgment brief is sufficient to raise the issue of whether they are entitled to summary judgment on her retaliation claims.

Ms. Robles next contends that Defendants have asserted new grounds for summary judgment in their reply brief on her claim for breach of a purported contract to pay "all damages" arising from an alleged negligent medical procedure on June 10, 2019. Ms. Robles is correct that Defendants assert in the reply for the first time the contention that her breach of contract claim is non-cognizable in light of her pending state court medical malpractice suit, and that the medical malpractice lawsuit provides a basis for the court to decline to exercise supplemental jurisdiction over her breach of contract claim. The court, however, does not consider Defendants' arguments raised for the first time in their reply brief and, in addressing Defendants' motion for summary judgment on Ms. Robles' breach of contract claim, relies solely on Defendants' arguments set forth in their summary judgment brief.

As another reason to strike Defendants' reply, Ms. Robles points to pages from the deposition of fact witness Lori Hirsh that were attached in an appendix to Defendants' reply. The court will not consider any deposition transcripts attached to Defendants' reply that were not part of their original summary judgment motion. *See* N.D. Tex. L. Civ. R. 7.2(e) (appendix may accompany a motion or response, not a reply).

In sum, the court declines to consider any arguments raised for the first time in Defendants' reply brief or new evidence submitted in the appendix to their reply brief. Accordingly, the court **denies as moot** Ms. Robles' Motion to Strike Reply.

### B. Alternative Motion for Leave to File Surreply

In the alternative to her Motion to Strike Reply, Ms. Robles requests leave to file a surreply. Defendants oppose her request. Once a motion is filed, the Local Civil Rules permit a response by the nonmovant and a reply by the movant. *See* Local Civil Rule 7.1. Thus, the movant is entitled to file the last pleading. "Surreplies, and any other filing that serves the purpose or has the effect

of a surreply, are highly disfavored, as they usually are a strategic effort by the nonmovant to have the last word on a matter." *Bailey v. Mansfield Indep. Sch. Dist.*, No. 3:18-CV-1161-L, 2019 WL 175088, at *2 (N.D. Tex. Jan. 10, 2019) (Lindsay, J.). The undersigned has found that surreplies usually are not particularly helpful in resolving pending matters, and it only permits filings beyond Local Civil Rule 7.1 in "exceptional or extraordinary circumstances." *Id.* Consequently, a party must not seek leave to file a surreply as a routine matter.

Ms. Robles has failed to persuade the court that this is an "exceptional or extraordinary" circumstance warranting a surreply. She contends a surreply is appropriate because Defendants have included new legal theories in their reply brief and new evidence with their reply brief. In its denial of Ms. Robles' Motion to Strike Reply as moot, the court has already declined to consider any new arguments raised by Defendants in their reply brief or new evidence that Defendants have included in the appendix to their reply brief. Because the court is not considering any new arguments or evidence, there is no arguable basis for a surreply.

Insofar as Ms. Robles is seeking to file a surreply to address Defendants' factual and legal summary judgment arguments, the court concludes she has had ample opportunity to do this. As Defendants correctly note, "Plaintiff is now on her *twelfth* pleading related to Defendants' motion for summary judgment in this straight-forward [sic] single plaintiff case." Defs.' Resp. to Pl.'s Mot. to Strike Reply 4 (Doc. 66) (original emphasis).

For these reasons, the court concludes that no exceptional or extraordinary circumstances have been presented by Ms. Robles that would warrant her filing a surreply or delaying the court's determination of the pending motion for summary judgment in this case, which is more than two years old and is set for trial on the court's four-week docket beginning September 6, 2022. *See* First Am. Sch. Order (Doc. 23). In addition, as the court has declined to consider new arguments

raised by Defendants in their reply brief or new evidence attached to their appendix in support of

their reply brief, Ms. Robles' arguments supporting her request for a surreply have been rendered

moot. Accordingly, the court **denies** Ms. Robles' alternative Motion for Leave to File Summary

Judgment Surreply.

## V.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all of Ms. Robles' claims. They contend that

they terminated her employment because of documented, ongoing issues with her conduct and job

performance, for which she had been previously warned, demoted, and reprimanded, and not

because of any unlawful motives. In her response, Ms. Robles contends that genuine disputes of

material fact preclude summary judgment on her claims. The court first addresses Defendants'

motion for summary judgment with respect to Ms. Robles' claims under the FMLA.

### A.  Ms. Robles' FMLA Claims Against Defendants

"The FMLA was enacted to permit employees to take reasonable leave for medical reasons,

for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious

health condition." *Elsensohn v. St. Tammany Par. Sheriff's Off.*, 530 F.3d 368, 372 (5th Cir. 2008).

"The FMLA creates two types of protections – entitlement rights (sometimes also called

prescriptive rights) and proscriptive rights." *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 526 (5th

Cir. 2021). The FMLA's prescriptive rights create a series of substantive rights, *see Elsensohn*,

530 F.3d at 372, which include, namely, the right of an eligible employee "to take up to twelve

weeks of leave in any one-year period to address a family member's or the employee's own serious

health condition." *Bryant v. Texas Dep't of Aging & Disability Servs.*, 781 F.3d 764, 768 (5th Cir.

2015). "An employee's right to return to the same position after a qualified absence [also] falls

under this category." *Mauder v. Metropolitan Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574,

580 (5th Cir. 2006); *see also Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004). More specifically, under 29 U.S.C. § 2614 (hereinafter, "Section 2614"), "[u]pon an employee's return from a qualified leave, employers must restore the employee to either 'the position of employment held by the employee when the leave commenced' or 'an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" *Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 834 (5th Cir. 2020).

Claims for violations of the above prescriptive rights are brought under 29 U.S.C. § 2615(a)(1), which makes it unlawful for an employer to interfere with, restrain, or deny the exercise or attempted exercise of FMLA rights. *See Haley*, 391 F.3d at 649; *see also Amedee*, 953 F.3d at 834-35 (providing that "[c]laims for failure to restore are also known as entitlement claims and are brought under § 2615(a)(1).").

The second set of provisions in the FMLA are proscriptive in nature and "bar employers from penalizing employees and other individuals for exercising their rights." *Elsensohn*, 530 F.3d at 372. Claims for violations of these proscriptive rights are brought under 29 U.S.C. § 2615(a)(2), which makes it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA. *See* 29 U.S.C. § 2615(a)(2); *Haley*, 391 F.3d at 649 ("The proscriptive FMLA rights include an employee's right not to be discriminated or retaliated against for having exercised the right to take FMLA leave."). The Department of Labor has interpreted this statutory provision to forbid employers from terminating employees for having exercised or attempted to exercise FMLA rights. 29 C.F.R. § 825.220(c).

Plaintiff's First Amended Complaint asserts Defendants violated her prescriptive and proscriptive rights under the FMLA, citing to Section 2615(a)(1) and Section 2615(a)(2). *See* Pl.'s

First Am. Compl. ¶ 10. In addition, the First Amended Complaint raises a failure-to-restore claim under Section 2614. *See id.* ¶ 9. As to this claim, Ms. Robles alleges:

> Plaintiff would show that Defendant violated Section 2614(a)(1) of the FMLA, in that she was entitled to FMLA leave at the time of her termination, such that terminating her amounted to denial of leave, and specifically denial of her right to be restored to the position of employment she held when the leave commenced.

*Id.* Defendants seek summary judgment on all of Ms. Robles' FMLA claims. The court first addresses her FMLA discrimination and retaliation claim.

### 1.   Ms. Robles' Discrimination and Retaliation Claim – Section 2615(a)(2)

Ms. Robles brings a claim against Defendants for discrimination and retaliation in violation of the FMLA's proscriptive provisions. She contends that Defendants discriminated and retaliated against her for seeking to use FMLA leave by discharging her on December 9, 2019, without legitimate cause. Given that Ms. Robles has presented no direct evidence, the court determines that this is an indirect evidence case. Generally, the *McDonnell Douglas* burden-shifting framework applies to determine whether an employer terminated an employee in retaliation for exercising FMLA rights. *See Amadee*, 953 F.3d at 835; *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this framework, the employee must first meet her burden of establishing a prima facie case of discrimination and retaliation, which requires Ms. Robles to present evidence that "(1) [s]he was protected under the FMLA; (2) [s]he suffered an adverse employment action; and (3) the adverse action was taken because [s]he sought protection under the FMLA." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 2013) (citing *Mauder*, 446 F.3d at 583).[5]

---

[5] In *Mauder*, the Fifth Circuit stated that for an employee to establish a prima facie that he was fired in retaliation for his request to take leave, such employee must show the following: "1) he was protected under the FMLA; 2) he suffered an adverse employment action; and 3) he was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because he

"In evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the temporal proximity between the FMLA leave and the termination." *Mauder*, 446 F.3d at 583 (citation and internal quotation marks omitted). Further, an employee "does not have to show that the protected activity is the only cause of [her] termination." *Id.* (citation omitted). An employee, however, "is required to show that the protected activity and the adverse employment action are not completely unrelated." *Id.* (citing *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)).

If the employee succeeds in making a prima facie case, the burden of production (though not persuasion) shifts to the employer to "articulate a legitimate, nondiscriminatory or nonretaliatory reason" for its action. *Ion*, 731 F.3d at 390-91. If the employer does this, the burden swings back to the employee, who "must offer sufficient evidence to create a genuine [dispute] of fact either that (a) [Defendants'] proffered reason is a pretext for discrimination, or . . . (b) that [Defendants'] reason, although true, is but one of the reasons for their conduct, another of which was discrimination." *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).[6] "If the employee proves that discrimination was *a* motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action despite the discriminatory animus." *Id.* (original emphasis).[7]

---

sought protection under the FMLA." *Mauder v. Metropolitan Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006) (citation omitted).

[6] Here, a modified *McDonnell Douglas* mixed-motive framework applies because Ms. Robles contends that FMLA discrimination was a motivating factor in her termination, rather than the sole reason for it.  *See Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005) (holding that the modified *McDonnell Douglas* mixed-motive framework applies to FMLA claims in which an employee alleges that retaliatory animus was a motivating factor in an adverse employment action); *see generally Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003).

[7] The court recognizes that the Supreme Court has limited the applicability of the mixed-motive framework in cases involving Title VII retaliation claims.  *See University of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). The Fifth Circuit has not yet determined whether the reasoning of *Nassar* applies to

a.   *Prima Facie Case*

Defendants argue that Ms. Robles cannot establish a prima facie case because she "did not engage in protected activity." Defs. Summ. J. Brief 17, note 5. Specifically, in a footnote, Defendants argue "Ms. Robles was sent home pending an investigation of her conduct. Robles had not exercised any FMLA rights prior to her termination for the ongoing performance and conduct issues." *Id.*

In response, Ms. Robles maintains that her "summary judgment evidence incontestably raises an issue of fact that she engaged in protected conduct under Section 2615(a)(2) of the FMLA by giving notice of a need for treatment of a serious medical condition first in an emergency room and then by surgery." Pl.'s Summ. J. Resp. Brief 39 (Doc. 39).

"Although a plaintiff is not required to specifically state that [s]he is asserting rights under the FMLA, [s]he must 'provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.'" *Wilson v. Noble Drilling Servs., Inc.*, 405 F. App'x 909, 913 (5th Cir. 2010) (quoting 29 C.F.R. § 825.302(c)).

---

FMLA retaliation cases. *See Wheat v. Florida Parish Juvenile Justice Comm'n*, 811 F.3d 702, 706 (5th Cir. 2016) ("Neither [the Fifth Circuit], nor the Supreme Court, has decided whether the heightened "but for" causation standard required for Title VII retaliation claims applies with equal force to FMLA retaliation claims."). While Defendants urge the court to abandon the mixed-motive analysis in an FMLA, they concede that the Fifth Circuit has not yet decided against the application of the mixed-motive analysis in an FMLA retaliation case. In the absence of any authority holding that *Nassar* applies to Ms. Robles' FMLA retaliation claims, the court, in keeping with other district courts in this division, applies the mixed-motive standard. *See, e.g.*, *Busken v. City of Greenville, Texas*, No. 3:19-CV-02808-X, 2021 WL 5140827, at *6 (N.D. Tex. Nov. 3, 2021) (Starr, J.) (allowing plaintiff bringing FMLA retaliation claim to proceed under mixed-motive standard); *Cathcart v. YP Advert. & Publ'g LLC*, 2017 WL 4298135, at *4 (N.D. Tex. Sept. 27, 2017) (Lynn, C.J.) (allowing plaintiff bringing FMLA retaliation claim to proceed under mixed-motive standard because Fifth Circuit has not held otherwise and employer failed to argue otherwise); *Wojcik v. Costco Wholesale Corp.*, 2015 WL 1511093, at *11, n.20 (N.D. Tex. Apr. 2, 2015) (Fitzwater, J.) (assuming that plaintiff bringing FMLA retaliation claim can proceed under mixed-motive standard because Fifth Circuit has not held otherwise).

Ms. Robles testified at her deposition that on November 5, 2019, her pain management physician made her aware of the urgent necessity for anterior cervical fusion surgery (which ultimately took place on December 12, 2019) to address the condition of her cervical spinal discs, and she advised Mr. Castro, Ms. Roberts, and Ms. Lopp that she would need to have this surgery. Pl.'s Summ. J. Resp. App. 185-188, 190-191, 1133. Mr. Castro was aware of her need for surgery and asked Ms. Robles to delay the surgery until late December 2019 or early January 2020 because Defendants could not afford to have a nurse out during the fourth quarter. *Id.* at 187-188, 207-208. To suit Mr. Castro, Ms. Robles agreed, with the consent of her surgeon, to schedule her surgery for late December. *Id.* at 187-188, 190. Ms. Roberts testified at her deposition that she was aware as early as November 25, 2019, of the possibility of Ms. Robles having neck surgery, was aware of her preoperative appointment scheduled for December 9, and that she asked Ms. Robles how long she would need for recovery. *Id.* at 1179-1183. She testified that she likely asked her how long she would need for recovery after the surgery to determine whether "it would require FMLA if she did." *Id.* at 1184. Mr. Griffin also testified at his deposition that he recalled addressing FMLA issues with Ms. Robles. *Id.* at 679, 681-682.

It is uncontroverted that on Monday, December 9, 2019, prior to receiving Mr. Griffin's phone call notifying her of her termination, Ms. Robles sent Ms. Lopp a text message informing Ms. Lopp that she was preparing to have urgent surgery because of severe pain, and that she had a doctor's appointment and preoperative visit that day. *Id.* at 478, 486. Ms. Robles' text message to Ms. Lopp stated "I have not heard from anyone yet and I'm getting quite concerned. I have my doctor's appointment and preop[erative] visits today, so I will need someone to contact me." *Id.* at 478. In addition, it is uncontroverted that Ms. Robles attempted to reach Ms. Roberts on December

6 and over the weekend, on December 7 and December 8, to inform her of her visit to the emergency room and her need for surgery. *Id.* at 195, 1100.

On this evidence, viewed in the light most favorable to Ms. Robles, the court concludes that she has raised a genuine dispute of material fact as to whether she provided "verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of such leave." 29 C.F.R. § 825.302(c).

Defendants also argue she cannot make out a prima facie case because "she has not shown a causal link between any alleged exercise of FMLA rights and her termination." Defs.' Summ. J. Brief 18. The court disagrees and finds that she has met her prima facie burden. She was terminated on December 9, 2019, one business day after she had to leave work mid-day because of such severe pain that she required a visit to the emergency room and, ultimately, neck surgery on December 12, 2022. *See Swanson v. General Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) ("Close timing between an employee's protected activity and an adverse action against h[er] may provide the causal connection required to make out a prima facie case of retaliation." (cleaned up)); *Mauder*, 446 F.3d at 583 ("When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the temporal proximity between the FMLA leave, and the termination.") (cleaned up).

For these reasons, the court **denies** Defendants' summary judgment motion insofar as they contend she did not make out a prima facie case of discrimination and retaliation under the FMLA.

*b.  Legitimate, Nondiscriminatory Reason for Termination*

The burden of production now shifts to Defendants to offer a legitimate, non-discriminatory or nonretaliatory reason for Ms. Robles' termination.  Defendants assert and have presented evidence that Ms. Robles was warned, demoted, reprimanded, and discharged based on

ongoing issues with her job performance, most notably her unprofessional conduct and her tardiness. The court concludes that Defendants' explanation constitutes a legitimate, nondiscriminatory or nonretaliatory reason for Ms. Robles' termination. *See Rachid v. Jack in the Box*, 376 F.3d 305, 313 (5th Cir. 2004) ("[V]iolating a non-discriminatory company policy is adequate grounds for termination[.]"); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995); W*atts v. L-3 Comm'ns Corp.*, 2013 WL 3789868, at *6 (N.D. Tex. July 22, 2013) (Fish, J.) ("A violation of a company policy is unquestionably a legitimate, nondiscriminatory reason for termination.") (collecting cases).

### c. Pretext or Motivating Factor

In this third step, Ms. Robles can either show that Defendants' reason for her termination is pretext or that discrimination was a factor in her termination. *Richardson*, 434 F.3d at 333. Under the latter scenario, she "bears the burden of offering sufficient evidence to create a genuine dispute of material fact that [Defendants'] nondiscriminatory reasons, although true, are only some of the reasons for [their] conduct, another of which was discrimination." *Ion*, 731 F.3d at 391. In other words, she must offer evidence to show "that the exercise of his FMLA rights was a motivating factor in h[er] termination." *Id.*

Ms. Robles has presented sufficient evidence to create a genuine dispute of material fact as to whether her attempt to exercise of her FMLA rights was a motivating factor in her discharge. Ms. Robles first points to the timing of her termination. Specifically, she was terminated on December 9, 2019, one business day after she had to leave work mid-day because of such severe pain that she required a visit to the emergency room and, ultimately, neck surgery on December 12, 2022. While the Fifth Circuit has recognized that "[c]lose timing between an employee's protected activity and an adverse action may provide the 'causal connection' necessary to establish

a prima facie case of retaliation," *Swanson*, 110 F.3d at 1188, suspicious timing alone is insufficient to establish pretext. *See id.*; *see also Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004). Here, however, Ms. Robles offers more than merely suspicious timing. Ms. Robles also offers Ms. Roberts' deposition testimony that on Friday, December 6, 2019, after Ms. Robles was forced to stop work and left to the emergency room for her pain, Ms. Lopp told Ms. Roberts that Ms. Robles has "got to go." Pl.'s Summ. J. Resp. App. 183-184, 1090-1091. Ms. Roberts testified at her deposition that, although she at first thought this meant that Ms. Robles had to go to the hospital, Ms. Lopp made it clear to her that she meant that Ms. Robles "needed to be terminated." *Id.* at 215. Ms. Lopp told the same thing to Mr. Castro. *Id.* at 855.

These hostile remarks and the temporal proximity of Ms. Lopp's remarks to Ms. Robles' termination, taken as a whole, are sufficient to raise a genuine dispute of material fact as to whether discrimination or retaliation was a motivating factor in Ms. Robles' termination. Thus, the court may not grant summary judgment on Plaintiff's FMLA discrimination and retaliation claims under Section 2615(a)(2).

Finally, in the context of seeking summary judgment on her FMLA discrimination and retaliation claims, Defendants do not argue or produce any evidence that they would have fired Ms. Robles anyway, just that the "reasons" for firing her predate her request for FMLA leave. Instead, Defendants contend that a mixed-motive framework should not be applied in this case as "there is no evidence retaliatory motives were at play." Defs.' Summ. J. Brief 17, note 6.

Accordingly, the court will deny Defendants' Motion for Summary Judgment as to Ms. Robles' FMLA discrimination and retaliation claims.

## 2.  Ms. Robles' FMLA Entitlement Claim (Failure-to-Restore Claim)

Ms. Robles also asserts an FMLA entitlement claim. She alleges that, at the time of her termination, she was entitled to leave under the FMLA, and that Defendants interfered with her right to be restored to her position by terminating her employment. Pl.'s First Am. Compl. ¶ 9.

Under 29 U.S.C. § 2615(a)(1), an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under the FMLA. 29 U.S.C. § 2615(a)(1). To establish a prima facie case of interference under the FMLA, Ms. Robles must show "(1) [s]he was an eligible employee; (2) h[er] employer was subject to FMLA requirements; (3) [s]he was entitled to leave; (4) [s]he gave proper notice of h[er] intention to take FMLA leave; and (5) h[er] employer denied h[er] the benefits to which [s]he was entitled under the FMLA." *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017). If the plaintiff makes out a prima facie case, the burden shifts to her employer to articulate a legitimate, nonretaliatory reason for the employment action at issue. *Id.* If the employer does so, the burden shifts to the plaintiff, who must raise an issue of material fact that the employer's proffered reason was pretextual. *Id.*

Defendants argue they are entitled to summary judgment because Ms. Robles is unable to establish a prima facie case under the fifth element. They contend "Robles cannot establish the fifth element of her prima facie interference claim because EMC did not deny her any benefit to which she was entitled." Defs.' Summ. J. Brief 15 (Doc. 30).[8]

---

[8] Defendants also assert that Ms. Robles has failed to establish the first element, because she does not specify any alleged, serious health condition that required leave. Defendants further challenge the fourth element, contending that they do not concede she gave proper notice. Defs.' Summ. J. Brief 15 (Doc. 30). Beyond mentioning these elements, however, Defendants do not make any explicit arguments in support, and also state that the court "need not decide those issues to dispose of her FMLA claims." *Id.* at note 4. Even were the court to consider these two elements, it concludes that Ms. Robles has provided sufficient evidence that she had a serious health condition under the FMLA and gave proper notice.

**Memorandum Opinion and Order - Page 31**

"An employee generally has the right to be reinstated to his previous position or an equivalent position upon his return from FMLA leave." *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 306 (5th Cir. 2021) (citing 29 U.S.C. § 2614(a)(1)(A)-(B)). This "right is not unlimited, however." *Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 681 (5th Cir. 2013). In *Hester*, the Fifth Circuit stated:

> the FMLA does not impose a strict liability standard requiring employers, in all circumstances, to reinstate employees following their FMLA leave. Under the FMLA, an employee is only entitled to those rights to which he would have been entitled had he not taken FMLA leave. Accordingly, an employee claiming a violation of his right to reinstatement must actually be entitled to the position to which he seeks reinstatement.

11 F.4th at 306 (internal citations and quotation marks omitted). As the Fifth Circuit emphasized in *Shirley* and several cases since then, including *Hester*, "denying reinstatement to an employee whose right to restored employment had already been extinguished—for legitimate reasons unrelated to his efforts to secure FMLA leave—does not violate the [FMLA]." *Shirley*, 726 F.3d at 682; *Hester*, 11 F.4th at 306. An employer, therefore, may challenge an employee's "right to return to work after a qualified absence . . . by offering evidence that the employee would have lost his position even had he not taken FMLA leave." *Amedee*, 953 F.3d at 836. "[T]he employer has an evidentiary burden on summary judgment to prove that the plaintiff would have lost his position even if he had not taken FMLA leave." *Hester*, 11 F.4th at 307. "If the employer satisfies this burden, then the plaintiff must present evidence sufficient to raise a jury question that [the employer's] stated reason for firing him . . . was pretextual." *Id.*

Defendants contend that Mr. Griffin informed Ms. Robles of her termination on the afternoon of December 9, 2019, prior to her being placed on FMLA leave; therefore, they argue, Ms. Robles was not actually entitled to be returned to her position because they planned to fire her anyway. Ms. Robles counters, however, that she advised Mr. Castro, Ms. Roberts, and Ms. Lopp—

well in advance of her termination—that she would need to have surgery, that she postponed taking leave for surgery at Mr. Castro's request, and that Ms. Roberts testified at her deposition that she was aware as early as November 25, 2019, of the possibility of the surgery and the potential need for FMLA leave. *See* Pl.'s Summ. J. Resp. App. 185-191, 1179-1183.[9] Ms. Robles also notes that her doctor provided that her leave was retroactive to December 6, 2019, which is three days before she was terminated.

The entitlement provisions of the FMLA do not apply "whe[n] the wheels of termination were put in motion before the request for leave." *Nero v. Industrial. Molding Corp.*, 167 F.3d 921, 926 (5th Cir. 1999) (cleaned up). Defendants focus on when Ms. Robles' physician filled out the form authorizing her medical leave, which was during her preoperative visit to him on December 9, 2019, but the Fifth Circuit focuses on the request for the leave—which, here, was made as early as late November 2019, based on Ms. Roberts' deposition testimony that she was aware as early as November 25, 2019, of the possibility of Ms. Robles' surgery and the potential need for FMLA leave. *See* Pl.'s Summ. J. Resp. App. 1179-1183. For these reasons, the court finds a genuine dispute of material fact exists as to when "the wheels of termination were put in motion" and whether Defendants had notice of Ms. Robles' need for FMLA leave prior to her termination. *See Nero*, 167 F.3d at 926 (affirming jury verdict concluding that employer did not decide to terminate employee before employee suffered a heart attack where the evidence showed close timing, lack of documentation of performance issues, and conflicting representations to employee); *Busken v. City of Greenville, Texas*, No. 3:19-CV-02808-X, 2021 WL 5140827, at *7 (N.D. Tex. Nov. 3, 2021) (Starr, J.) (denying employer's motion for summary judgment on FMLA entitlement claim

---

[9] "Although a plaintiff is not required to specifically state that [s]he is asserting rights under the FMLA, [s]he must 'provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.'" *Wilson v. Noble Drilling Servs., Inc.*, 405 F. App'x 909, 913 (5th Cir. 2010) (quoting 29 C.F.R. § 825.302(c)).

after finding that "a genuine dispute of material fact exists as to when the wheels of termination were put in motion.") (internal quotation marks and citation omitted); *Jackson v. Methodist Hosps. of Dallas*, No. 3:05-CV-1345-N, 2006 WL 8439545, at *3 (N.D. Tex. Nov. 1, 2006) (Godbey, J.) (denying employer's motion for summary judgment on FMLA entitlement claim, in part, because "genuine issues of material fact" remained regarding whether employer terminated employee before or after learning of her FMLA request).

Accordingly, the court **denies** summary judgment on the FMLA entitlement claim.

## B.  Ms. Robles' Disability Claims

Ms. Robles brings claims under the ADA and TLC for failure to accommodate her alleged disability and for wrongful termination because of her disability. Defendants move for summary judgment on both claims.

### 1.    Failure-to-Accommodate Claim

The ADA prohibits discrimination in employment against a qualified individual on the basis of her disability. *See* 42 U.S.C. § 12112(a). Under the ADA, to "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). Similarly, the TLC provides that it is unlawful for an employer "to fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability . . . unless [the employer] demonstrates that the accommodation would impose an undue hardship on the operation of the business." Tex. Lab. Code Ann. § 21.128(a).

The elements of a failure-to-accommodate claim under the ADA and TLC are substantially similar. To prevail on an ADA or TLC failure-to-accommodate claim, a plaintiff must show that: "(1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Clark v. Champion Nat'l Sec., Inc.,* 952 F.3d 570, 587 (5th Cir.), *cert. denied sub nom. Clark v. Inco Champion Nat'l Sec., Inc.*, 141 S. Ct. 662 (2020) (citation omitted).[10]

Defendants move for summary judgment on Ms. Robles' failure-to-accommodate claim on many grounds, the first of which is that she has failed to establish that she is an individual with a disability. They contend that during her employment she had a five-pound lifting restriction and was supposed to use a brace for her hand as needed for a period of four weeks. Defendants contend the "ADA does not apply to such temporary conditions." Defs.' Summ. J. Brief 21 (citing cases).

In response, Ms. Robles asserts that Defendants' argument "is based on the complete misconception that her disability was reflected only in temporary lifting restrictions to which [she] was subjected in September 2019. This is akin to the Wizard of Oz warning Dorothy to not look under the curtain." Pl.'s Summ. J. Resp. 44.[11] According to Ms. Robles, "[her] disability was established by her continuing cervical spinal problems from which she suffered beginning in early

---

[10] In *Clark*, the Fifth Circuit, after noting that the language of the TLC parallels that of the ADA, applied the same prima facie elements to a failure-to-accommodate claim under the TLC and ADA. *Clark,* 952 F.3d at 578 n.16 and 587.

[11] The court notes that the actual quotation is: "Pay no attention to that man behind the curtain." https://parade.com/1280055/kaigreen/wizard-of-oz-quotes/. The court confesses that it does not understand the connection between Plaintiff's reference to this quotation and her argument that Defendants apparently misunderstood the nature of her disability claim in their motion for summary judgment.

**Memorandum Opinion and Order - Page 35**

2019, complicated by carpal tunnel syndrome and CPRS from which she suffered as a consequence of conduct of a representative of Defendants . . . ." *Id.*[12]

Thus, in her response, Ms. Robles is contending that her disability is her "continuing spinal cervical problem" that was exacerbated by Defendants' alleged conduct, and that Defendants failed to accommodate this disability, rather than the disability Defendants identified in their summary judgment brief. Problematically, Ms. Robles has not pleaded such a claim. In her First Amended Complaint, she does not even allege what her disability is. The only disability she even remotely alleges in her complaint is "complex regional pain syndrome and nerve damage" after Defendants allegedly gave her an improperly undiluted form of phenergen after a steroid injection. *See* First Am. Compl. 2. In addition to failing to identify her disability, she does not identify any specific accommodation.

Ms. Robles cannot rely on this new claim (that is, failure to accommodate her "cervical spinal problems") as a basis to avoid summary judgment. *See, e.g.*, *Orthoflex, Inc. v. ThermoTek, Inc.*, 983 F. Supp. 2d 866, 873 (N.D. Tex. Oct. 31, 2013) (Fitzwater, C.J.) ("[A] claim [that] is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." (citation omitted)); *Barnard v. L-3 Commc'ns Integrated Sys. L.P.*, No. 3:16-CV-0282-D, 2017 WL 3726764, at *4 (N.D. Tex. Aug. 30, 2017) (granting motion for summary judgment on failure-to-accommodate claim when the plaintiff, in her response to motion for summary judgment, raised a purported disability that she had not alleged in complaint).

Even assuming Ms. Robles had properly pleaded a failure-to-accommodate claim based on her "continuing spinal cervical problem," her claim would still be denied as a matter of law. Specifically, in her response, Ms. Robles argues that her accommodation claim is based on her

---

[12] Based on her response, the court concludes Ms. Robles has abandoned any failure-to-accommodate claim related to her lifting restrictions and need for a brace.

alleged need for leave at the time of her termination on December 9, 2019, and not the temporary, five-pound lifting restrictions imposed by her doctor for four weeks during her employment. She argues further that Defendants' decision to terminate her employment amounts to a denial of leave as an accommodation.

This argument fails as a matter of law. As Defendants correctly note, once Ms. Robles contends she was eligible for FMLA leave, the FMLA controls the analysis. *See Acker v. GM, L.L.C.*, 853 F.3d 784, 791 (5th Cir. 2017) (affirming dismissal of the plaintiff's ADA disability discrimination claim because the plaintiff's requests for FMLA leave were not requests for reasonable accommodations under the ADA); *see also Harville v. Texas A&M Univ.*, 833 F. Supp. 2d 645, 661 (S.D. Tex. 2011) (citing *Trevino v. United Parcel Serv.*, No. 3:08-CV-889-B, 2009 WL 3423039, *12 (N.D. Tex. Oct. 23, 2009) (Boyle, J.)) ("FMLA leave is not a reasonable accommodation under the ADA; rather it is a right enforceable under a separate statutory provision.").

There is no genuine dispute of material fact regarding this new claim, and Defendants are entitled to judgment as a matter of law. Accordingly, the court **grants** Defendants' summary judgment motion with respect to Ms. Robles' failure-to-accommodate claims under the ADA and TLC.

## 2.      Discrimination and Retaliation Based on Disability

The court turns next to Ms. Robles' claim that Defendants violated the ADA and TLC by discriminating and retaliating against her based on her disability.

Because Ms. Robles relies on circumstantial evidence to support her ADA and TLC claims, they are properly analyzed under the *McDonnell Douglas* burden shifting framework. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999) (holding that *McDonnell Douglas* framework

applies to ADA cases when only circumstantial evidence of discrimination is offered). As modified, the *McDonnell Douglas* framework consists of three stages. First, Ms. Robles must establish a prima facie case of discrimination, which "creates a presumption that [Defendants] unlawfully discriminated against [her]." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). To establish a prima facie case of disability discrimination, a plaintiff must show that:

> (a) [she] is disabled, has a record of having a disability, or is regarded as disabled, (b) [she] is qualified for [her] job, (c) [she] was subjected to an adverse employment action on account of [her] disability or the perception of [her] disability, and (d) [she] was replaced by or treated less favorably than non-disabled employees.

*Drechsel v. Liberty Mut. Ins. Co.*, 695 F. App'x 793, 798 (5th Cir. 2017) (per curiam) (brackets in original) (quoting *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009)).[13]

As both the TLC and ADA prohibit disability discrimination, courts look to analogous federal precedent when interpreting the TLC. *See NME Hosps., Inc. v. Rennels*, 944 S.W.2d 142, 144 (Tex. 1999); *Kiser v. Original, Inc.*, 32 S.W.3d 449, 452 (Tex. App.—Houston [14 Dist.] 2000, no pet.); *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 474-74 (5th Cir. 2006); *Troupe v. Cintas Corp.*, 2000 WL 1056327, at *2 (N.D. Tex. July 31, 2000) (Lynn, J.).[14]

---

[13] The court notes that Texas courts of appeal have held that to establish a prima facie case of disability discrimination, a plaintiff must show (1) he has a disability; (2) he qualified for the job; and (3) an adverse employment decision was made because of his disability. *See, e.g., Donaldson v. Texas Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 436-37 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *Texas Dep't of State Health Servs. v. Rockwood*, 468 S.W.3d 147, 156 (Tex. App.—San Antonio 2015, no pet.). As the outcome in this case is the same under either formulation, this court, like other courts in the Dallas Division, will assume that the four-element prima facie case set out in *Drechsel* applies. *See, e.g., Alviar v. Macy's Inc.*, 2017 WL 4698449, at *6 (N.D. Tex. Oct. 19, 2017) (Fitzwater, J.).

[14] The ADA was amended by the ADA Amendments Acts of 2008 ("ADAAA"), which took effect on January 1, 2009. 42 U.S.C. § 12101, *et seq.* The ADAAA made it "easier for people with disabilities to obtain protection under the ADA." *Weems v. Dallas Indep. Sch. Dist.*, 260 F. Supp. 3d 719, 727-28 (N.D. Tex. 2017) (Lindsay, J.) (quoting *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016) (in turn quoting 29 C.F.R. § 1630.1(c)(4)). The amendments broadened the definition of "disability" by "construing the substantially limits standard in favor of broad coverage." *Cannon*, 813 F.3d at 590 (internal quotation marks omitted). The bottom line in a "post-amendment case is thus whether [plaintiff's] impairment substantially limits his ability 'to perform a major life activity as compared to most people in

Second, if Ms. Robles establishes a prima facie case, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the employment action taken against her. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). Defendants' burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).

Third, if Defendants meet their production burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination created by Ms. Robles' prima facie case disappears, and "the burden shifts back to [her] to make an ultimate showing of intentional discrimination." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012).

Defendants contend that they are entitled to summary judgment on Ms. Robles' ADA and TLC discrimination and retaliation claims because she "cannot establish the first element of her prima facie case because she is not disabled." Defs.' Summ. J. Brief 21. They also argue she cannot meet the third element of her prima facie case, that she was subjected to an adverse employment action on account of an alleged disability or subjected to disparate treatment. Defendants further contend that, even assuming *arguendo* that Ms. Robles had met the elements of her prima facie case, she cannot establish that their proffered legitimate, nondiscriminatory reasoning for firing her was a pretext for unlawful intentional discrimination.

The court first addresses Defendants' contention that Ms. Robles has failed to establish that she was disabled within the meaning of the ADA and TLC. Section 21.002(6) of the Texas Labor Code defines "disability" as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having

---

the general population.'" *Id.* at 591 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). To the extent either party relies on superseded provisions of the ADA in support of an argument, the court gives no weight to that argument.

**Memorandum Opinion and Order - Page 39**

such an impairment." Tex. Lab. Code Ann. § 21.002(6) (West 2015). Similarly, a person is disabled under the ADA if she (1) has a physical or mental impairment that substantially limits one or more of the major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2).

As previously discussed in the context of Ms. Robles' failure-to-accommodate claim, she contends in her response to the motion for summary judgment that her disability is her "continuing spinal cervical problem" that was exacerbated by Defendants' alleged conduct, rather than the disability Defendants identified in their summary judgment brief. Pl.'s Summ. J. Resp. 44. Once again, Ms. Robles has not pleaded such a claim. In her First Amended Complaint, she does not even allege what her disability is. The only disability she even remotely alleges in her complaint is "complex regional pain syndrome and nerve damage" after Defendants allegedly gave her an improperly undiluted form of phenergen after a steroid injection. *See* First Am. Compl. 2.

As with her failure-to-accommodate claim, Ms. Robles cannot rely on this alleged disability that she did not plead as a basis to avoid summary judgment. *See Barnard*, 2017 WL 3726764, at *4 (granting motion for summary judgment on failure-to-accommodate claim when the plaintiff, in her response to motion for summary judgment, raised a purported disability that she had not alleged in complaint).

In addition, even assuming she has alleged her "continuing spinal cervical problem" as her disability, she fails to provide summary judgment evidence from which a reasonable juror could conclude that it constituted "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2). Further, in her summary judgment response brief, she does not argue that she "has a record of such impairment", or (3) was "regarded as having such an impairment." *See id.*

**Memorandum Opinion and Order - Page 40**

For all of these reasons, there is no genuine dispute of material fact regarding her claims for discrimination and retaliation based on disability. Accordingly, Defendants are entitled to judgment as a matter of law, and the court **grants** Defendants' summary judgment motion with respect to Ms. Robles' disability and retaliation claims under the ADA and TLC.

### C.  Breach of Contract Claim

Ms. Robles asserts that she and EMC had a verbal agreement to pay her "all damages arising from the negligent administration to her of improperly diluted Phenergan on June 10, 2019." Pl.'s First Am. Compl. ¶ 12. She alleges that this includes "lost compensation and benefits, and all expenses of treatment of Plaintiff relating to her injury." *Id.* ¶ 6. Defendants move for summary judgment on her breach of contract claim, contending that the purported contract fails to meet the most basic elements under Texas law.

The elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Eckland Consultants, Inc. v. Ryder, Stillwell, Inc.*, 176 S.W.3d 80, 86 (Tex. App—Houston [1st Dist.] 2004, no pet.). The elements are the same for written and verbal contracts, and all elements must be present for a contract to be binding. *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

To have a valid contract, there must be a meeting of the minds as to the material terms, and all material terms must be sufficiently definite to be enforceable. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *David J. Sacks, PC v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008). To be enforceable, a contract must address all of its essential and material terms with a "reasonable degree of certainty and definiteness." *Pace Corp. v. Jackson*, 284 S.W.2d 340, 345 (Tex. 1955). A contract must at least be sufficiently definite to confirm that both parties intended

to be contractually bound. *Fort Worth Ind. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). Even when that intent is clear, the agreement's terms must be sufficiently definite to enable a court to understand the parties' obligations and to give an appropriate remedy if the terms are breached. *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 237 (Tex. 2016). An agreement that leaves material matters open for future adjustment and agreement that never occur is not binding upon the parties. *Fort Worth Ind. Sch. Dist.*, 22 S.W.3d at 846.

Defendants contend the alleged terms here are anything but definite and certain and cite to Ms. Robles' deposition testimony in support of their summary judgment motion. They also argue that it is apparent from her deposition testimony that there was no agreement. The court has reviewed her deposition testimony and agrees with Defendants.

Ms. Robles testified as follows:

Q.    Now, is it your position that EMC agreed to pay for your medical expenses?

A.    They did pay for them – some of them.

Q.    Who did you communicate with about any payment for medical expenses?
A.    Rhonda.

Q.    And what communications did you and Rhonda have about this? Were they verbal or in writing?

A.    Verbal.

Q.    And what do you remember about your communications with Rhonda about your medical expenses?

A.    She asked me to submit receipts of out-of-pocket expenses and negotiated with me to have the procedure necessary completed at Eminent so that I would not be charged, which I later received a bill after I was terminated. And the first set, I guess, of receipts that I gave her of out-of-pocket expenses she had Eric write me a check to reimburse me for them and a second check to reimburse me for the days off.

**Memorandum Opinion and Order - Page 42**

\* \* \*

Q.    Again, nothing in writing about these payments?

A.    Not until she opened the insurance claim.

Q.    When was an insurance claim opened?

A.    I don't know when it was opened because Rhonda just started telling me, you need to talk to Sally and I had no idea who Sally was and finally I called her and I spoke to her and she sent me an email.

\* \* \*

Q.    Who do you understand Sally to work for?

A.    The insurance company.

Q.    So she's not an employee of EMC?

A.    No.

\* \* \*

Q.    So this arrangement was all based on verbal conversations that you had with Rhonda, correct?

A.    Yes.

Q.    And what did Rhonda explain to you is the reason for the payments?

A.    Reimbursement for out-of-pocket expenses related to the injury. She said, you were a patient, don't worry, when I kept saying that I was concerned about the costs of all this affecting my employment.

Q.     Anything else that Rhonda explained to you is the reason for the payment?

A.    It was reimbursement for expenses related to the injury.

Q.    Was there anything else that Rhonda communicated to you about payment for expenses?

A.    That I needed to save my receipts and give them to Sally.

\* \* \*

Q.    So were there expenses that you claim were not covered by Rhonda?

**Memorandum Opinion and Order - Page 43**

A.     After the first set of receipts, when I collected a second set of receipts to give her, that was when she said to keep them and give them to Sally at this point; that they – it would be better for everyone if the insurance company was able to assess it and determine how much was going to need to be covered.

Q.     And did you, in fact, submit receipts to Sally?

A.     She never said that it was time to do that. She said that the first step was obtaining the medical records.

Q.     So you did not submit receipts to Sally, correct?

A.     I don't believe so.

* * *

Q.     Did Rhonda Lopp tell you that she would cover your expenses, you know, unlimited?

A.     After the first set of – because initially we didn't know what was wrong. After the first payment and surgery, she said that what would happen is the insurance company would determine a – what that diagnosis was worth, I suppose, based on what future, predictable expenses I might have. If I'm not using the right terminology, I apologize. I'm not in insurance.

Q.     I just want you to answer questions to the best of your ability. So to recap here. Is it fair to say that EMC paid some expenses and then turned it over to insurance?

A.     Yes. That was my understanding of what happened.

Defs.' Summ. J. App. 61-66.

Viewing this evidence in the light most favorable to Ms. Robles, as it must, the court agrees with Defendants that her own testimony negates the existence of the alleged contract. The testimony shows that Defendants paid her two checks to help her with out-of-pocket expenses associated with her medical procedure in August 2019. The court concludes there is no evidence of a meeting-of-the-minds, and the contract is insufficiently definite to be enforceable.

In her response, Ms. Robles contends that the payment of two checks was a partial performance of an agreement to pay her damages. As Defendants correctly argue, however, this

argument presupposes there was an enforceable agreement in the first instance. *See, e.g., Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455-458 (Tex. App.—Fort Worth 2009, pet. denied.) (affirming summary judgment and holding that alleged oral agreement that employee would receive a percentage of the fair market value of the company upon his termination was too indefinite as a matter of law, as among other things there was no understanding as to how "fair market value" was to be determined).

As Ms. Robles fails to raise a genuine dispute of material fact that a breach of contract occurred, Defendants are entitled to judgment as a matter of law, and the court **grants** Defendants' motion for summary judgment on Ms. Robles' breach of contract claim. Because the court concludes that Ms. Robles fails to provide evidence of a contract that meets the requisite elements of a contract under Texas law, the court does not reach Defendants' additional arguments in support of their motion for summary judgment on her breach of contract claim.

## VI.    Plaintiff's Motion for Rule 11 Sanctions (Doc. 56)

The court next considers Ms. Robles' Motion for Rule 11 Sanctions. She maintains that Defendants' summary judgment brief "makes multiple factual representations and legal arguments which do not meet the standards of non-frivolous advocacy under Rule 11." Pl.'s Mot. for Sanctions ¶ 3 (Doc. 56). In response, Defendants argue:

> Defendants have not abused the legal process in connection with their summary judgment motion, or any other pleading. All factual and legal arguments are grounded in the record, existing law, and/or good faith arguments for the modification or extension of existing law, and Plaintiff concedes that Defendant's summary judgment brief was not filed for an improper purpose. Plaintiff's Rule 11 motion simply rehashes arguments made in connection with her summary judgment briefing. Such arguments – which merely question the legal and factual sufficiency of Defendants' summary judgment arguments – are not appropriate for a Rule 11 motion.

Defs.' Resp. to Pl.'s Mot. for Sanctions 1-2 (Doc. 64). For the reasons that follow, the court

concludes that Rule 11 sanctions are not warranted.

### A. Applicable Law

Rule 11(b) provides that, by presenting to the court a pleading, motion, or other paper, an

attorney is certifying that to the best of the attorney's knowledge, information, and belief, formed

after an inquiry reasonable under the circumstances,

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing of existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

"[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus . . .

streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx

Corp.*, 496 U.S. 384, 393 (1990). An attorney has a duty to conduct a "reasonable inquiry into the

facts and law of a case at the time [at] which she affixes her signature on any papers to the court."

*Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001). This court applies a

"snapshot" rule: sanctions under Rule 11 cannot be imposed "merely for the eventual failure of a

claim; rather, sanctions are to be applied only where, at the time of the filing, the position

advocated is unwarranted." *Matta v. May*, 118 F.3d 410, 415 (5th Cir. 1997). When Rule 11 has

been violated, the court must "carefully choose sanctions that foster the appropriate purpose of the

rule, depending upon the parties, the violation, and the nature of the case." *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 877 (5th Cir. 1988) (en banc).

Ms. Robles does not specify the subsection of Rule 11 on which her motion relies, but her argument appears to be based on Rule 11(b)(2). She does make clear that she is not asserting a Rule 11(b)(1) violation. Pl.'s Mot. for Sanctions ¶ 4(b).

Under Rule 11(b)(2), "[t]he essential issue is whether the signatories of [the filing] fulfilled their duty of reasonable inquiry into the relevant law." *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 989 F.2d 791, 793 (5th Cir. 1993). In determining whether an attorney has made a reasonable inquiry into the law, the court may consider: "the time available to the attorney to prepare the document; the plausibility of the legal view contained in the document; the pro se status of the litigant; and the complexity of the legal and factual issues raised." *Thomas*, 836 F.2d at 875-76.

Sanctions are appropriate under Rule 11(b)(2) when a party advocates a legal contention that is objectively unreasonable. *See Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 528 (5th Cir. 2016) ("An attorney's conduct is judged under each standard with an objective, not a subjective, standard of reasonableness."). "[A] trial court should not impose Rule 11 sanctions for advocacy of a plausible legal theory, particularly where . . . the law is arguably unclear." *Id.* (ellipsis in original) (quoting *CJC Holdings*, 989 F.2d at 794).

**B.  Discussion**

**1.  Bases for Plaintiff's Request for Rule 11 Sanctions**

*a.  Statute of Frauds - Tex. Bus. & Com. Code § 26.01(b)(8)*

In support of Rule 11 sanctions, Ms. Robles first contends that Defendants should be sanctioned for invoking the statute of frauds, in particular Section 26.01(b)(8) of the Texas Business and Commerce Code, as an alternative argument in support of their motion for summary

judgment on her breach of contract claim. Pl.'s Mot. for Sanctions ¶ 3a. To reiterate, in the First Amended Complaint, Ms. Robles alleges Defendants breached an oral agreement to pay her all damages arising from the alleged negligent medical procedure performed on June 10, 2019, including "lost compensation and benefits, and all expenses of treatment of Plaintiff related to her injury." First Am. Compl. ¶¶ 6, 12. Defendants sought summary judgment on Ms. Robles' breach of contract claim on numerous grounds, the last of which was that the contract claim was barred by the statute-of-frauds provision that the following type of promises or agreements had to be in writing to be enforceable: "an agreement, promise, contract, or warranty of cure relating to medical care or results thereof made by a physician or health care provider as defined in Section 74.001, Civil Procedure and Remedies Code." Tex. Bus. & Com. Code § 26.01(b)(8). *See* Defs.' Summ. J. Brief 27 (citing Tex. Bus. & Com. Code § 26.01(b)(8)).

In support of her Motion for Sanctions, Ms. Robles contends the specified provision of the statute of frauds is inapplicable on its face, and "there is no case addressing Section 26.01(b)(8) which applies to a contract of the kind made the basis of [her] claim." Pl.'s Mot. for Sanctions ¶ 3a. In response, Defendants urge the court to reject Ms. Robles' "suggest[ion] that Rule 11 sanctions are warranted for the mere invocation of the statute of frauds." Defs.' Resp. to Mot. for Sanctions 4 (Doc. 64). Defendants point out that in her request for oral argument on the summary-judgment related motions, "Plaintiff concedes that the issue of whether the specific statutory provision (Tex. Bus. & Com. Code § 26.01(b)(8)) applies to her purported oral agreement is 'an issue of first impression.'" *Id.* (quoting Pl.'s Am. Request for Oral Argument 2, Doc. 60). Defendants further assert that "[a]t a minimum, there is clearly a good faith argument that the statute of frauds provision applies to Plaintiff's purported agreement to pay 'all damages' relating

to an alleged medical procedure (the very same procedure that is the subject of Plaintiff's personal injury lawsuit)." *Id.*

Defendants fail to cite any case addressing Section 26.01(b)(8) in the context of a breach of contract claim such as that asserted by Ms. Robles, and the court has located no case on point. In her request for oral argument, however, Ms. Robles describes the issue of whether Section 26.01(b)(8) applies to her breach of contract claim based on an oral agreement as "an issue of first impression." Pl.'s Am. Request for Oral Argument 2 (Doc. 60). Her description of the issue as one of first impression is at odds with her argument that Defendants' invocation of Section 26.01(b)(8) merits Rule 11 sanctions. Further, the court notes that Defendants are "health care providers" and the alleged oral agreement relates to "medical care."

"If abused, Rule 11 may chill attorneys' enthusiasm and stifle the creativity of litigants in pursuing novel factual or legal theories. As a result, all will suffer." *Thomas*, 836 F.2d at 885; *accord* Rule 11 advisory committee's note (1983 amendment). Mindful of this admonition, the court concludes that Defendants' statute-of-frauds theory, asserted as one of many alternative bases for summary judgment on her breach of contract claims —while ultimately unpersuasive— is not objectively unreasonable. Sanctions are, therefore, not warranted on this basis.

### b. *Statute of Frauds – Partial Performance*

Second, Ms. Robles contends that Defendants should be sanctioned for invoking the statute of frauds as a bar to her breach of contract claim based on her deposition testimony that Defendants "actually paid lost compensation and medical expenses to [her], thereby partially performing the contract alleged by [her] even while partial performance is [] a recognized exception to the statute of frauds under applicable law." Pl.'s Mot. for Sanctions ¶ 3b. In response, Defendants argue that Ms. Robles is "confus[ing] Rule 56 and Rule 11. Rule 11 applies only to Defendants' affirmative

pleadings filed with the Court. Rule 11 imposes no duty on counsel to anticipate arguments that a nonmovant may assert in response to a motion for summary judgment properly filed under Rule 56." Defs.' Resp. to Mot. for Sanctions 4-5. The court agrees. Ms. Robles may seek to avoid summary judgment on her breach of contract claim by making this argument, but it is not a proper basis for a Rule 11 motion seeking sanctions. *See SortiumUSA, LLC v. Hunger*, No. 3:11-CV-1656-M, 2014 WL 1080765, at *6 (N.D. Tex. Mar. 18, 2014) (recognizing "the meaningful differences between the purposes and standards associated with Rule 11, a rare and extraordinary remedy that governs the imposition of certain types of sanctions, and Rule 56, which governs motions for summary judgment.") (citation omitted); *see also* 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1336 (2d ed. Supp. 2003) ("Rule 11 should not be used to raise issues of legal sufficiency that more properly can be disposed of by a motion to dismiss, a motion for a more definite statement, or a motion for summary judgment."). Sanctions are, therefore, not warranted on this basis.

### c.   Lack of Consideration

Third, Ms. Robles faults Defendants and seeks Rule 11 sanctions based on their invocation of lack of consideration as a bar to her breach of contract claim, while she, at the time the alleged contract was made, "refrained from filing suit to recover amounts agreed to be paid by her, constituting consideration under hornbook Texas contract law, as consideration includes any detriment to a promise." Pl.'s Mot. for Sanctions ¶ 3c. In response, Defendants maintain that Ms. Robles "again confuses Rule 11 and Rule 56." Defs.' Resp. to Mot. for Sanctions 5. The court agrees. Ms. Robles may present her argument that she provided consideration in her response to the motion for summary judgment, as she did in this case, but it is not a basis to seek Rule 11 sanctions. Sanctions are, therefore, not warranted on this basis.

### d.   FMLA Claims

Next, Ms. Robles seeks sanctions with respect to numerous factual and legal contentions made by Defendants with respect to her FMLA claims. *See* Pl.'s Mot. for Sanctions ¶¶ 3d-3f. The court has carefully considered Ms. Robles' contentions related to her FMLA claims and concludes that she is repeating many of the same arguments she made in response to Defendants' motion for summary judgment. For example, she takes issue with Defendants' contention that they are entitled to summary judgment on her FMLA claim because she lacks a "serious medical condition." *Id.* at ¶ 3d. As Defendants correctly note, Ms. Robles' "disagreement with an argument in a summary judgment motion does not demonstrate abuse of the legal process." Defs.' Resp. to Mot. for Sanctions 6. The court, therefore, denies Ms. Robles' Motion for Sanctions on the grounds set forth in paragraphs 3(d) through 3(f) of her Motion.

### e.   Disability Claims

Ms. Robles seeks sanctions with respect to numerous factual and legal contentions made by Defendants with respect to her ADA and Texas Labor Code disability claims. *See* Pl.'s Mot. for Sanctions ¶¶ 3g-3i. She takes issue with Defendants' argument that she lacks a disability and that she failed to engage in protected conduct. Ms. Robles presented her argument that she has raised genuine disputes of material fact as to these elements of her disability claim in her response to the motion for summary judgment; however, it is not a basis to seek Rule 11 sanctions.

She also seeks sanctions because she contends Defendants raised new arguments in their reply brief. This, however, is not a basis for the imposition of Rule 11 sanctions.

In summary, based on the foregoing analysis, the court **denies** Plaintiff's Motion for Rule 11 Sanctions.

## 2.    Defendants' Request for Attorney's Fees under Fed. R. Civ. P. 11(c)(2)

In their opposition to Plaintiff's Motion for Sanctions, Defendants ask the court to "exercise its discretion to award [them] their attorney's fees incurred in responding to the baseless Rule 11 motion." Defs.' Resp. to Pl.'s Mot. for Sanctions 12 (Doc. 64). In reply, Ms. Robles opposes this request and states:

> [I]nadequate as their overall response to the motion for sanctions may be, Defendants[] attempt to turn the tables and seek an award of attorney's fees against Plaintiff. An adolescent, even childish, argument that this Court should punish their accuser when they do not explain their own behavior is properly rejected.

Pl.'s Reply to Defs.' Resp. to Pl.'s Mot. for Sanctions 9 (Doc. 65).

Rule 11(c)(2) provides the court with discretion to award reasonable expenses, including attorney's fees, to the prevailing party on a sanctions motion. *See* Fed. R. Civ. P. 11(c)(2) ("If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion."); Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment ("[T]he court may award to the person who prevails on a motion under Rule 11— whether the movant or the target of the motion—reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion."). As a judge of this district aptly noted:

> [a]n award of reasonable expenses under Rule 11(c)(2) is not a sanction for violating Rule 11(b). A court is therefore not required, in considering a request for reasonable expenses pursuant to Rule 11(c)(2), to apply the substantive requirements of Rule 11(c)(4)-(6). Instead, the court applies the requirements of Rule 11(c)(2) itself, which provides that the award of expenses to the prevailing party must be "warranted" and "reasonable."

*Shippitsa Ltd. v. Slack*, No. 3:18-CV-1036-D, 2019 WL 277613, at *10 (N.D. Tex. Jan. 22, 2019) (Fitzwater, J.) (citations omitted).

Although the court has denied Plaintiff's Motion for Rule 11 Sanctions, Defendants have failed to persuade the court that Ms. Robles lacked *any* good-faith arguments in her Motion for

Rule 11 Sanctions or that reasonable expenses, including attorney's fees, are warranted in this case. *Contrast Vanliner Ins. Co. v. DerMargosian*, No. 12-5074, 2014 WL 1632181, at *2 (N.D. Tex. Apr. 24, 2014) (Fitzwater, C.J.) (awarding reasonable expenses to party opposing motion for sanctions when the party requesting sanctions had lacked any good-faith arguments for its motion). Further, the cases cited by Defendants in support of their request for attorney's fees are from outside the Fifth Circuit and, therefore, not binding on the court. *See* Defs.' Resp. to Pl.'s Mot. for Sanctions 12 (citing cases). Accordingly, the court **denies** Defendants' request for attorney's fees incurred in responding to Ms. Robles' Motion for Sanctions.

## VII.   Defendants' *Daubert* Motion (Doc. 26)

Ms. Robles has designated Dr. Allyn Needham, Ph.D., an economist and certified earnings analysist, as a damages expert to testify about the economic damages from Ms. Robles' allegedly wrongful job termination. Dr. Needham's report is dated July 27, 2020. *See* Defs.' *Daubert* Mot. at Ex. B (Doc. 26-1). On August 6, 2021, Ms. Robles designated Dr. Needham as an expert witness expected to testify as to her economic damages. *Id.* at Ex. C.

Defendants argue that Dr. Needham's report and expert testimony concerning Ms. Robles' damages should be excluded pursuant to Federal Rule of Evidence 702 as unreliable and irrelevant. The court will address Defendants' arguments and Ms. Robles' response after setting forth the applicable legal standard.

### A.   Applicable Legal Standard

The admissibility of evidence is a procedural issue governed by federal law. *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985). Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

The trial court acts as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge" that is non-scientific in nature. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). In *Kumho Tire,* the Supreme Court resolved a split among the circuits and held that *Daubert*'s "gatekeeping" function applied to all expert opinion testimony based on specialized knowledge, not merely scientific expert testimony.

As part of its gatekeeping role, the court determines the admissibility of expert testimony based on Rule 702, and *Daubert* and its progeny. The amendments to Federal Rule of Evidence 702, effective December 1, 2000, essentially codify *Daubert* and *Kumho Tire.* The Advisory Committee's Notes to Rule 702 state that the determination of whether an expert's opinions are reliable is based upon sufficient facts or data that calls for a "quantitative rather than qualitative analysis." In addressing this issue, the "question is whether the expert considered enough information to make the proffered opinion reliable. . . . The expert must base [his or her] opinion on at least the amount of data that a reliable methodology demands." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268 (2d ed. 1987). Further, in reviewing a *Daubert* challenge, the court makes no credibility determinations; it only decides whether the

threshold reliability standards have been satisfied. *See* Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amendments).

"The court may admit proffered expert testimony only if the proponent . . . demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *E.E.O.C. v. S & B Indus., Inc.*, No. 3:15-CV-641-D, 2017 WL 345641, at *2 (N.D. Tex. Jan. 24, 2017) (citing *Kumho Tire Co.*, 526 U.S. at 147) (internal quotation marks omitted). The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turn[] upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted). To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Fed. R. Evid. 702(d) (requiring that an "expert has reliably applied the principles and methods to the facts of the case").

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Fed. R. Evid. 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d at 355 (citation and internal quotation marks omitted). "The

reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief," *Johnson*, 685 F.3d at 459 (internal quotation marks omitted); however, "there is no requirement that an expert derive his opinion from firsthand knowledge or observation." *Deshotel v. Wal-Mart La., L.L.C.*, 850 F.3d 742, 746 (5th Cir. 2017) (internal quotation marks omitted).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018) (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)). "The proponent need not prove to the judge that the expert's testimony is correct, but [it] must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). On the other hand, if "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable, as "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"[C]ourts consider the following non-exclusive list of factors when conducting the reliability inquiry: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). These factors, however, are not definitive or exhaustive. The reliability inquiry is flexible, and the district court conducting the *Daubert* analysis has discretion in determining which factors are most germane in

light of the nature of the issue, the particular expertise, and the subject of the expert's testimony. *Daubert*, 509 U.S. at 593-95; *Kumho Tire Co.*, 526 U.S. at 142.

The district court's gatekeeping role, however, is not meant "to serve as a replacement for the adversary system: Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Primrose Operating Co. v. National Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)); *accord Williams*, 898 F.3d at 624 (quoting *Daubert*, 509 U.S. at 596). Thus, the district court's "*Daubert* analysis should not supplant trial on the merits," *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (citation omitted), and, generally speaking, issues regarding the bases and sources of an expert's opinion that affect the weight of an opinion rather than the admissibility of the opinion "should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). The reasoning behind this general rule is consistent with the Advisory Committee's Notes to Rule 702, which state:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amendments).

### B.   Discussion

Defendants move to exclude Dr. Needham's damages analysis under Rule 702 and *Daubert* as "unreliable" and "irrelevant." Defs.' *Daubert* Mot. 8-9. In support, they argue that, rather than providing an opinion related to economic damages from Ms. Robles' alleged wrongful

termination, he opines as to her lost earning capacity based on her alleged physical injury she contends she suffered as a patient at EMC. They maintain that these calculations, while relevant to her pending medical malpractice state court action against Defendants arising from her alleged injuries as a patient, are not relevant to her wrongful termination claims at issue in this lawsuit, as "the ADA and FMLA do not allow for recovery of 'lost earning capacity' due to reduced physical capacity." *Id.* at 1, 8. Defendants also argue that Dr. Needham's report is unreliable and irrelevant because Ms. Robles found comparable employment, and "it is settled that comparable employment such as that Robles obtained after her termination from EMC cuts off lost wages, including back pay and front pay as does termination for cause[.]" *Id.* at 8. Notwithstanding that she found comparable employment after her termination, Dr. Needham's analysis in his July 2020 report calculates her lost earning capacity through her retirement. *Id.* at 2. In addition, Defendants seek to exclude Dr. Needham's analysis because Ms. Robles did not supplement his July 2020 report to include the last several years of her employment history, thereby rendering "his analysis unhelpful." *Id.* at 2. Finally, they seek to exclude Dr. Needham's report because he relies on the opinion of Dillon Snowden, Ph.D., who has not been designated as an expert witness in this case. *Id.* at 8-9.[15]

In response, Ms. Robles takes issue with Defendants' contentions and argues that the motion is "too clever by way more than half." Pl.'s Resp. 1 (Doc. 43). She also accuses Defendants of a "doublecross" with respect to scheduling Dr. Needham's deposition (which never occurred)

---

[15] In his expert report, Dr. Needham states that he is relying on Dr. Snowden's "vocational analysis" of Ms. Robles, dated July 21, 2020. Doc. 43-1 at 14. In response to Defendants' *Daubert* motion, Ms. Robles includes with her appendix a copy of Dr. Snowden's report. According to the report, Dr. Snowden is a rehabilitation consultant. In his report, he considers Ms. Robles' "employability and wage[-]earning capacity." *Id.* at 8. As Defendants correctly note, Dr. Needham relies on Dr. Snowden's report, although Dr. Snowden has not been designated as an expert witness in this case.

**Memorandum Opinion and Order - Page 58**

and places the blame on them for Ms. Robles' failure to supplement Dr. Needham's July 2020 report, as follows:

> Dr. Needham's report was to be updated and his deposition on the updated report was to take place until Defendants' [sic] decided to dishonor the parties' agreement and file their [*Daubert*] motion, leading the undersigned Plaintiff's counsel justifiably in his email within exhibit 2 to refer to a "doublecross" by Defendants. With respect to the claim of any delay in seeking an updated report of Dr. Needham, . . . it was Defendants that deferred the taking of a deposition of Dr. Needham, necessarily accompanied by an updated report, and then left hanging whether they were going to proceed with a deposition of Dr. Needham at all, as reflected in the emails within Exhibit 2.

*Id.* at 3. In addition, Ms. Robles requests an award of attorney's fees for the legal services represented in her response to the *Daubert* motion "[i]n view of the inexcusably sharp practice represented by Defendants' motion." *Id.* at 8.

In reply, Defendants argue that Ms. Robles' "double-cross conspiracy theory narrative is not only false, but it is entirely irrelevant and a distraction from the real issue, which is that Robles is trying quite blatantly to recover medical malpractice damages in two separate lawsuits, pursuing a double recovery." Defs.' Reply 6 (Doc. 54). They argue as follows:

> Dr. Needham's analysis is not reliable because it purports to show losses that are not recoverable under the statutes at issue in this lawsuit. Additionally, the analysis projects losses over a multi-year period (until Robles's projected retirement) when, as a matter of law, any arguable entitlement to lost wages ended two years ago – in April 2020 when she accepted a higher paying job. For these and other reasons, Dr. Needham's analysis is unreliable and useless and would also confuse the jury and result in prejudice to Defendants. Further, the flaws in Dr. Needham's analysis will not be cured through supplementation or amendment. As such, Dr. Needham's analysis should be excluded and he should not be permitted to testify at trial.

*Id.* at 1.

Undeniably, a prevailing plaintiff may obtain back pay under the anti-discrimination statutes. *See Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 482-83 (5th Cir. 2007). In a wrongful termination case such as this, "[b]ack pay encompasses what the plaintiff would have received in

compensation but for the employer's [unlawful activities]," and accrues from the date of the unlawful termination until the date of the judgment. *See id.* Periods of disability, however, are "excluded in computing the back pay period." *Stephenson v. Nokia Inc.*, No. CIV A 3:06-CV-2204-B, 2008 WL 2669492, at *8 (N.D. Tex. May 1, 2008) (Boyle, J.) (citation omitted); *see also Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir.1993) (citations omitted) ("Saulpaugh is only entitled to losses suffered 'as a result' of defendants' discrimination. . . . Because Saulpaugh would not have been entitled to her salary from the Hospital while disabled, her losses after 1988 were not the result of the discrimination that she suffered.").

The record reflects that Dr. Needham's July 2020 report was prepared as part of the parties' early settlement attempts and was intended to address both Ms. Robles' alleged economic damages for purposes of her potential medical malpractice claims and her employment-related wrongful termination claims made in this action. *See* Doc. 43-2. As such, Dr. Needham's analysis, relying on Dr. Snowden's report, includes periods of disability in his lost earning capacity and back pay analysis.  As Dr. Needham's report seeks damages based on, *inter alia*, periods during which Ms. Robles was unable to work, and these amounts are not recoverable in this action brought under the FMLA and ADA, the court concludes Dr. Needham's analysis is both unreliable and irrelevant, and would be of no assistance to the jury.[16]

In addition, for reasons unclear to the court, Ms. Robles never supplemented Dr. Needham's report to take into account her subsequent employment history. Ms. Robles obtained a job with Premier in April 2020, as a manager making $90,000 annualized, which was more than

---

[16] Damages available under the ADA include injunctive relief, reinstatement (or front pay in lieu of reinstatement), back pay, compensatory damages, and attorney's fees and costs. 42 U.S.C. § 12117. Compensatory damages include, among other things, compensation for humiliation, pain, and suffering, and the like. 42 U.S.C. § 1981A(b)(3). Damages available under the FMLA include matters such as wages, salary and employment benefits, and in some cases liquidated damages. 29 U.S.C. § 107(a)(1)(A).

**Memorandum Opinion and Order - Page 60**

her salary at EMC. Defs.' *Daubert* Mot. at Exs. E, F, and I. The Fifth Circuit "recognizes that the back pay period may end when the plaintiff begins earning higher wages at his new job than he made at the terminated job." *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992) (citations omitted). Because Dr. Needham's report projects damages through Ms. Robles' retirement age, even though she obtained a higher paying job in April 2020, the court concludes his report is unreliable, of little use, and would confuse the jury. In addition, failure to include this information renders his report incomplete and unduly prejudicial to Defendants.

In summary, the court concludes that Dr. Needham's July 2020 report, which Ms. Robles never supplemented—nothwithstanding her statement in her objections and responses to Defendants' First Set of Interrogatories that "Plaintiff's expert will supplement the report with updated calculations from August 2020 through the present, and then again through trial" (Defs.' *Daubert* Mot. at Ex. D)—is both unreliable and contains irrelevant information that would be confusing for the jury and prejudicial to Defendants. Dr. Needham's analysis includes recovery of damages for lost earning capacity because of physical disability which, while relevant to her medical malpractice lawsuit, is irrelevant in this wrongful termination action brought pursuant to the FMLA and ADA. In addition, Dr. Needham's analysis fails to take into account that Ms. Robles obtained comparable employment with a higher salary following her termination, and instead he calculates lost wages through her retirement age. Moreover, the report reflects potential damages related to the state court medical malpractice case and has little utility, if any, with respect to the case pending before the court.

For these reasons, the court **grants** Defendants' *Daubert* Motion and will exclude Dr. Needham's July 2020 report and his testimony. In addition, the court **denies** Ms. Robles' request for attorney's fees she incurred in responding to the Defendants' *Daubert* Motion. It appears to the

court that both sides hold some level of responsibility for the tangled mess presented to the court for resolution by way of Defendants' *Daubert* Motion.

## VIII.   Conclusion

For the reasons stated herein, the court **grants in part** and **denies in part** Defendants' Motion for Summary Judgment (Doc. 29); **denies** Plaintiff's Motion to Strike Defendants' Motion for Summary Judgment Brief (Doc. 42); **denies** Plaintiff's Motion for Rule 11 Sanctions (Doc. 56); **denies as moot** Plaintiff's Motion to Strike Defendants' Summary Judgment Reply (Doc. 61), and **denies** Plaintiff's Motion for Leave to File Summary Judgment Surreply (Doc. 61), filed in the alternative; **grants** Defendants' *Daubert* Motion (Doc. 26); and **denies** Plaintiff's Amended Request for Oral Argument of Summary Judgment Related Motions (Doc. 60).

Defendants' Motion for Summary Judgment is **granted** with respect to Ms. Robles' disability claims and her breach of contract claim. As Ms. Robles has failed to raise a genuine dispute of material fact as to these claims, they are hereby **dismissed with prejudice**.  As genuine disputes of material fact remain for trial with respect to Ms. Robles' FMLA claims, Defendants' Motion for Summary Judgment is **denied** as to these claims.

As the court was about to file this document, it noted that the parties had filed a Joint Motion to Continue Pretrial Deadlines and Trial Pending Summary Judgment Ruling and Settlement Discussions Including Potential Mediation (Doc. 70). In light of the rulings made herein, the court **denies as moot** the Joint Motion to Continue Pretrial Deadlines and Trial Pending Summary Judgment Ruling and Settlement Discussions Including Potential Mediation (Doc. 70).

Given the court's rulings, which have consumed an inordinate amount of scarce judicial resources, the factual complexity of this case, and the time the case has been pending before this court, the court strongly encourages the parties to consider an expeditious resolution of the pending

claims. As for the remaining issues, the court notes that this is not an "open-and-shut case" for either side. As the court has made its definitive rulings, the parties are in a superior position to assess their relative strengths and weaknesses regarding the remaining claims. The court **directs** the parties to inform it in writing no later than **August 15, 2022**, whether they can resolve this action without further court involvement.

The court also advises the parties that if this action proceeds to trial, it will not allow the acrimony between the parties to continue. There is nothing wrong with strong advocacy by an attorney on behalf of his or her client; however, some of the accusations and conduct are simply "beyond the pale," and the court will not permit such conduct at trial.

As a final matter, the court informs the parties that it has a criminal trial set for the first two weeks in September, which conflicts with the trial setting in this action. Depending on whether this action is resolved and whether the criminal case proceeds to trial, the actual dates to try this action may have to be adjusted, or reset to a date in 2023.

**It is so ordered** this 3rd day of August, 2022.

Sam A. Lindsay
United States District Judge

**Memorandum Opinion and Order - Page 63**